546 A.2d 1296

David M. Barasch, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Armco, Inc. and Allegheny Ludlum Corporation, Petitioners v. Pennsylvania Public Utility Commission, Respondent.

West Penn Power Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

82

Argued May 25, 1988, before President Judge CRUMLISH, JR., and Judges CRAIG, DOYLE, BARRY, PALLADINO, MCGINLEY and SMITH.

*Pamela B. Sarvey,* Assistant Consumer Advocate, with her, *Irwin A. Popowsky,* Assistant Consumer Advocate, and *David M. Barasch,* Consumer Advocate, for petitioner, David M. Barasch, Consumer Advocate.

*Michael L. Kurtz,* with him, *F. Bruce Abel* and *David F. Boehm, Steer, Strauss, White & Tobias,* for petitioners, Armco, Inc. and Allegheny Ludlum Corporation.

*Michael D. McDowell,* with him, *Deborah M. DePaul, Thomas K. Henderson, John L. Munsch* and *Robert T. Vogler,* for petitioner, West Penn Power Company.

*Billie E. Ramsey,* Assistant Counsel, with her, *Bohdan R. Pankiw,* Deputy Chief Counsel, and *Daniel P. Delaney,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*Stephen C. Braverman,* with him, *John M. Elliott, Charles W. Bowser, Christopher J. Churchill* and *James*

*P. Cousounis, Baskin, Flaherty, Elliott & Mannino, P.C.,* for intervenor, Milesburg Energy, Inc.

*Henry R. MacNicholas,* with him, *Richard S. Kahlbaugh, McNees, Wallace & Nurick,* for amicus curiae, West Penn Power Industrial.

OPINION BY JUDGE CRAIG, August 22, 1988:

These consolidated cases are appeals by industrial ratepayers and the Office of Consumer Advocate (OCA) from an order of the Pennsylvania Public Utility Commission (PUC or commission) that (1) approved the terms of a proposed contract for the purchase of electric power by West Penn Power Company (West Penn) from Milesburg Energy, Inc. (MEI) as being in the public interest, (2) authorized West Penn to recover payments made to MEI under the contract from its ratepayers through the mechanism of the Energy Cost Rate (ECR), and (3) declared in effect that the generating capacity West Penn would acquire under the contract should not be considered by the commission in excess capacity determinations regarding West Penn during the term of the contract. West Penn itself appeals the PUC's refusal to publish the order in the *Pennsylvania Bulletin.*

West Penn's proposed purchase of power from MEI is covered by the federal Public Utility Regulatory Policies Act of 1978 (PURPA).[1] The issues raised are (1) whether the procedure by which the PUC considered West Penn's petition for approval of a contract covered by PURPA respected due process rights, and (2) whether the commission's decisions (a) to disregard the generating capacity acquired by this purchase when resolving West Penn excess capacity issues in the future, and (b)

[1] Pub. L. No. 95-617, 92 Stat. 3117 (1978), codified primarily in 16 U.S.C. §§796, 791a, 823a, 824a, 824d, 824i-824k, 824(b), 824(e), 825d, 2601-2603, 2611-2644, 2701-2708 and 2645.

to approve West Penn's payment of levelized capacity charges under the contract, violated the prohibition in the Public Utility Code against rate recovery of costs for capacity that is excess.

## I.   Background
### A.   Section 210 of the Public Utility Regulatory Policies Act of 1978

Congress enacted the Public Utility Regulatory Policies Act of 1978 as part of a package of five pieces of legislation, known collectively as the National Energy Act, designed to combat the nationwide energy crisis resulting from the quadrupling of oil prices in the early 1970's and the severe shortage of natural gas in 1977. Section 210 of PURPA, 16 U.S.C. §824a-3, is designed to lessen the dependence of electric utilities on foreign oil and on natural gas by encouraging the development of alternative power sources in the form of cogeneration and small power production facilities.

Section 201 of PURPA, 16 U.S.C. §796(17)-(22), defines "cogeneration facility" as one that produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. §796(18)(A). The same section defines "small power production facility" as one that has a production capacity of no more than 80 mega-watts and uses as a primary energy source biomass, waste, geothermal resources or renewable resources such as wind, water or solar energy to produce electric power. 16 U.S.C. §796(17)(A).

Before PURPA, entities contemplating cogeneration or small power production faced three principal deter-rents: (1) traditional electric utilities, customarily re-garded and regulated by the states as natural monopo-lies in terms of both generation and distribution of elec-

tric power,[2] either could refuse to buy power from these nontraditional facilities, or they could offer unfairly low rates for such purchases; (2) traditional utilities could refuse to sell essential backup power to alternative producers of electricity, or they could charge discriminatorily high rates for such sales; and (3) the alternative producers could become subject to state and federal regulation as public utilities, giving rise to significant financial and administrative burdens that could readily offset expected savings. Section 210 of PURPA addresses each of these problems.

Section 210(a) directs the Federal Energy Regulatory Commission (FERC) to promulgate rules to encourage the development of the alternative sources of power, including rules requiring utilities to offer to buy electricity from, and to sell electricity to, qualifying cogeneration and small power production facilities (QFs). Section 210(b) directs FERC to set rates for utility purchases of power from QFs that are (1) just and reasonable to the electric consumers of the utility and in the public interest, (2) not discriminatory against QFs, and (3) not to exceed the incremental cost to the utility of alternative electric energy. Rates for utility sales to QFs are to be just and reasonable and in the public interest and not discriminatory against QFs under section 210(c). Section 210(e) directs FERC to adopt rules exempting certain QFs from most state and federal public utility regulation.

Congress chose state regulatory authorities, with their expertise and unique knowledge of local conditions, to be the primary enforcers of PURPA. Section

---

[2] As PURPA clearly recognizes, and as the commentators point out, distribution of electric power may be a natural monopoly, but generation of that power is not. *See, e.g.* Lock, *Encouraging Decentralized Generation of Electricity: Implementation of the New Statutory Scheme*, 2 Solar L. Rep. 705, 712 (1980).

210(f) requires each state regulatory authority and nonregulated utility to implement FERC's rules. At the same time, section 210 and FERC's regulations give wide latitude to the state agencies in many areas in order to permit flexibility in accommodating local circumstances and to encourage experimentation in the development of this new national program.

In *Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742 (1982), the United States Supreme Court upheld section 210 as a valid exercise of Congress' power under the Commerce Clause to act in what the court previously had determined to be a fully preemptible field. The Court concluded that the grant of power to FERC to exempt QFs from state laws and regulations was nothing more than a form of traditional pre-emption. Further, because FERC permitted the states to implement PURPA by designating their regulatory agencies for the adjudication of disputes arising under the statute—the very type of activity customarily engaged in by these authorities—the majority held that the statute did not intrude upon state sovereignty in violation of the Tenth Amendment.

In two major rulemakings, FERC adopted regulations implementing PURPA,[3] codified at 18 C.F.R. §§292.101-292.602. The regulation adopted by FERC relating to purchases of power by utilities from QFs requires a rate of payment to the QFs equal to the utility's full "avoided cost" (FAC). 18 C.F.R. §292.304(b)(2). "Avoided costs" are defined in §292.101(b)(6) as "the incremental costs to the electric utility of electric energy or capacity[4] *or both* which, but for the purchase from

---

[3] *See.* 45 Fed. Reg. 12214 (February 25, 1980) *and* 45 Fed. Reg. 17959 (March 20, 1980).

[4] In the preamble to its publication of this rule, FERC noted that energy costs are the variable costs associated with the production of electric energy—the cost of fuel and some operating and

the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source."[5] (Emphasis supplied; footnote added.)

FERC considered and expressly rejected proposals that the rates it prescribed pursuant to section 210 should result in some savings to utility customers. Rather, FERC preferred to allocate the full savings typically realized by the cogeneration and small power production processes to the alternative producers themselves, noting that this allocation would provide the maximum encouragement of development of these resources, and that "ratepayers and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy." 45 Fed. Reg. 12222.

In *American Paper Institute, Inc. v. American Electric Power Service Corporation,* 461 U.S. 402 (1983), the Supreme Court upheld FERC's exercise of its authority under section 210(b) of PURPA to require a rate for utility purchases from QFs equal to the full avoided cost, that is, FERC's decision that FAC is just and reasonable to electric consumers and in the public interest. The Court determined that Congress did not intend

---

maintenance expenses. Capacity costs are those associated with providing the capability to deliver energy—primarily the capital costs of facilities. FERC concluded that "[i]f a qualifying facility offers energy of sufficient reliability and with sufficient legally enforceable guarantees of deliverability to permit the purchasing electric utility to avoid the need to construct a generating unit, to build a smaller, less expensive plant, or to reduce firm power purchases from another utility, then the rates for such a purchase will be based on the avoided capacity and energy costs. 45 Fed. Reg. 12216.

[5] The rate may be less than full avoided cost where it is based on costs of facilities whose construction was commenced before November 9, 1978, the effective date of PURPA. 18 C.F.R. §292.304(b)(1) and (3).

that the phrase "just and reasonable" in section 210(b), relating to rates for *purchases* by electric utilities from QFs, be given its traditional ratemaking meaning, although Congress did intend that the same phrase be interpreted according to its traditional meaning in section 210(c), relating to *sales* by utilities to QFs. *American Paper Institute,* 461 U.S. at 414-15.[6]

The regulatory scheme adopted by FERC also permits utilities and QFs to negotiate agreements for utility purchases of power independently of the prescribed rates. 18 C.F.R. §292.301. Thus, even if a state chooses to implement the FERC regulations by adopting rules of its own prescribing a purchase rate in detail, a utility and a QF may still negotiate a different rate, using the state-prescribed rate as a baseline. Because no large utility is exempt from the FERC regulation that requires filing of detailed utility cost data and projections with the state regulatory authority, 18 C.F.R. §292.302, a QF negotiating an agreement with a utility knows what rate it could compel if the utility failed to bargain in good faith.

---

[6] In a footnote, the Court observed that unless the phrase "just and reasonable" in section 210(b) of PURPA were to be regarded as mere surplusage, that language must be interpreted to mandate consideration of rate savings for consumers that could be produced by setting the rate at a level lower than the statutory ceiling, *i.e.,* lower than FAC. 461 U.S. at 415 n.9. Nevertheless, the holding of the case on this point is that FERC's adoption of FAC was proper. Because the federal oversight of the development of alternative sources of power is to be an ongoing process (section 210(a) requires FERC to adopt within one year "and from time to time thereafter revise" rules to encourage cogeneration and small power production), the Court's footnote perhaps may be best understood as a direction to FERC to monitor the effects of its rules and to reevaluate the FAC standard when the infant alternative power industry reaches a state of maturity that may require less encouragement.

Although privately negotiated contracts setting rates for QF power are essentially outside the federal and state rules, state public utility commissions have a duty to examine costs of such contracts claimed by a utility for the purpose of setting its own rates, and will disallow those found to be excessive. Therefore, the state regulatory authority plays an indirect role in the negotiating process. Utilities in Pennsylvania frequently have voluntarily sought preapproval by the PUC of the rates and terms and conditions of proposed contracts with QFs and approval of an automatic pass-through to ratepayers of the charges the utilities will pay under the contracts. Often the negotiated agreements make such advance PUC approval a condition precedent to any obligations on the part of the purchasing utility.

The Pennsylvania Public Utility Commission, after publication of proposed regulations and extensive public comment, implemented the FERC rules by adopting regulations contained in 52 Pa. Code §§57.31-57.39. *See* 12 Pa. B. 4237 (December 11, 1982).

### B. Agreement between West Penn and MEI

Under the terms of the Electric Energy Purchase Agreement between West Penn and MEI (agreement or contract), West Penn is to purchase the energy and capacity of a 43-megawatt generating unit (Milesburg project) that is to be installed by MEI at the site of the former Milesburg Power Station, which was owned and operated by West Penn and was retired from service with PUC approval in 1983. MEI is to purchase the facility from West Penn and convert it to be fueled by bituminous coal refuse, employing a circulating fluidized bed boiler technology that makes the economic burning of such waste feasible.

The agreement requires West Penn to purchase all of the capacity and energy from the Milesburg project

for a period of thirty years from project completion, expected to occur in 1990. West Penn agreed to pay a variable energy charge for each kilowatt hour produced by the project at a rate equal to actual monthly experienced energy costs of "proxy units" within the Allegheny Power System, of which West Penn is a member utility. In addition, West Penn agreed to make a capacity payment of 3.3 cents per kilowatt hour, which West Penn calculated to be the levelized present value cost (at the time of the signing of the agreement) of the capacity that West Penn could avoid over the term of the contract. West Penn will make no payments to MEI until MEI actually delivers energy to West Penn.

The agreement further provides that MEI is responsible for the construction, ownership and maintenance of the facility, subject to extensive approval and oversight by West Penn, and that MEI will compensate West Penn for the construction and maintenance of all interconnection equipment. West Penn will retain mortgage and security interests in the property of the Milesburg project. Because the agreement provides for direct capacity charges, it contains reserve fund and interruption insurance provisions as well as a provision subjecting MEI to substantial penalties if the facility fails to meet contractual generating requirements. Conditions precedent to West Penn's obligations under the agreement include certification of the Milesburg project by FERC as a qualifying facility under PURPA and the promulgation of a rule by the PUC or the existence of a PUC order, final beyond appeal, approving the legality of the agreement, published in the *Pennsylvania Bulletin.*

## C. *Procedural History*

On April 2, 1987, West Penn filed a petition with the PUC requesting that the commission publish a declaratory order in the *Pennsylvania Bulletin* for pub-

lic review and comment indicating that (1) unless exceptions were filed within thirty days of the date of publication, the commission would approve the agreement with MEI as complying with section 210 of PURPA and with the Public Utility Code, (2) upon the occurrence of the conditions precedent the PUC would authorize West Penn to pass the charges resulting from the agreement through to its customers by the mechanism of the Energy Cost Rate or such other method as might replace the ECR, and (3) the addition of the Milesburg project capacity would not result in an excess capacity determination under the Public Utility Code as to the MEI capacity itself or as to any existing West Penn capacity. West Penn served copies of its petition on the active parties to its most recent base rate proceeding, including Armco, Inc. and Allegheny Ludlum Corporation (Armco/Allegheny), the Office of Consumer Advocate and a group of industrial customers identified as the West Penn Industrial Intervenors (WPII).

MEI filed a statement in support of West Penn's petition and a petition to intervene. The PUC's Office of Trial Staff (OTS) filed an answer to West Penn's petition, as did OCA. Armco/Allegheny filed, jointly, a petition to intervene and a motion to dismiss West Penn's petition or, in the alternative, a request for a hearing. West Penn filed responses to the pleadings of OTS, OCA and Armco/Allegheny, as did MEI. The commission did not hold hearings on the petition.

As discussed in n.4, above, full avoided costs for a long-term guaranteed purchase, such as this contract will establish, include both avoided energy costs and avoided capacity costs. The commission concluded that the contract's method for calculating the energy cost component of FAC was reasonable. In addition, the commission calculated that the maximum legal capacity cost component of FAC would have been 4.67 cents per

kilowatt hour. Therefore, the commission approved the contract's capacity cost credit rate of 3.3 cents per kilowatt hour.

The PUC adopted the order described above on September 17, 1987, order entered September 22, 1987, at Docket No. P-870216. The commission did not grant West Penn's request that the order be published in the *Pennsylvania Bulletin*. West Penn and Armco/Allegheny applied for reconsideration of the commission's order, and OCA filed a petition for clarification and reconsideration. By a vote of two to two at a public meeting held October 22, 1987, the commission declined to grant reconsideration. West Penn, OCA and Allegheny/Armco appealed separately from the PUC's September 22, 1987, order, and this court consolidated the appeals.

## II.  Issues and Analysis
### A.  PUC Procedure for Considering Utility/QF Contracts

In its petition at No. 2499 C.D. 1987, Armco/Allegheny first raises a fundamental due process challenge to the procedure by which the PUC approved the legality of the rates set forth in West Penn's contract with MEI. Armco/Allegheny avers (1) that West Penn did not give general notice to its ratepayers regarding its action in seeking PUC approval of a contract that would result in a substantial rate increase, (2) that the commission did not hold hearings permitting interested parties to present evidence and cross-examine witnesses, and (3) that the commission's order was premised on mistaken factual assumptions not contained in the record.

West Penn, in its petition at No. 2522 C.D. 1987, contends that the due process rights of its ratepayers would be protected adequately if the commission would grant West Penn's request that the commission publish

its order in the *Pennsylvania Bulletin,* with the effective date of the order postponed for thirty days to allow interested parties to submit written comments.[7]

In the present case, West Penn filed with the PUC and maintained for public inspection detailed cost data reports as required by 52 Pa. Code §57.33 (which implements the utility cost data reporting requirements of 18 C.F.R. §292.302), including data relating to projected energy costs as well as the utility's plan for additions to its plant and the estimated costs for such additions (*i.e.,* capacity costs), all for the current year and for each of the next ten years. The PUC has made its method for calculating the capacity cost component of FAC a part of its regulations implementing PURPA. *See* 52 Pa. Code §57.34.

Armco/Allegheny's basic due process claim is that it was not afforded an opportunity to challenge at a full hearing the details of West Penn's cost data filing, from which the commission calculated the maximum allowable capacity cost credit, or the details of the commission's factual assumptions and mathematical computations in calculating the credit.

The Pennsylvania Supreme Court has considered in depth the issue of procedural due process in the context of administrative action in a sequence of cases beginning with *Conestoga National Bank of Lancaster v. Patterson,* 442 Pa. 289, 275 A.2d 6 (1971). In *Conestoga,* banks with principal offices in a particular town

---

[7] West Penn and the PUC are correct in their contention that Armco/Allegheny, because it received actual notice of West Penn's petition, is really asserting the notice rights of other persons, and it lacks standing to do so. *See, e.g., Mifflin County School District v. Monsell,* 95 Pa. Commonwealth Ct. 173, 504 A.2d 1357 (1986). However, West Penn, in its efforts to protect the commission's favorable order from future collateral attack, clearly does have standing to raise the issue of proper notice to its customers.

challenged the action of the Department of Banking in approving the application of another bank to establish a branch office in that town without conducting a hearing on the existing banks' protests or giving those banks access to the application data. The Court observed:

> Procedural due process does not require notice and a hearing in every conceivable situation involving administrative action. . . . However, these procedural safeguards should accompany a situation where the administrative action is adjudicatory in nature and involves substantial property rights.

*Conestoga*, 442 Pa. at 296, 275 A.2d at 9 (citation omitted).

The Court concluded that the department's decision was adjudicatory in nature and that the decision involved substantial property rights of the applicant, the protestants and the surrounding financial community. Therefore, the Court concluded that procedural due process required that the protesting banks be afforded notice, a hearing, the opportunity to present evidence and access to the application and supporting data concerning a proposal for a new branch. *Id.* at 299-300, 275 A.2d at 11. The Court noted, however, that the nature of banking proceedings might justify the use of proceedings of less formality than a full trial-type adversary hearing. *Id.*

In *Pennsylvania Coal Mining Association v. Insurance Department*, 471 Pa. 437, 370 A.2d 685 (1977), an association of coal mining companies challenged the statutory procedure by which rates for black lung insurance (which the companies were required by statute to purchase) were proposed by a private insurance industry group and then deemed into effect unless the Insurance Commissioner took action to disapprove or to modify them. The Court concluded that the protections of

procedural due process applied to the approval of the rates in question, then stated:

> We must next determine what procedures due process requires. '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). See generally Friendly, Some Kind of a Hearing, 123 U.Pa.L.Rev. 1267 (1975). '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748-49, 6 L.Ed.2d 1230 (1961). We must determine the private interest at stake, the value of any additional procedural safeguards, and the government's interest in proceeding without providing such procedures. Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

*Pennsylvania Coal,* 471 Pa. at 449-50, 370 A.2d at 691.

The Court considered and rejected the proposition that the statutory provision allowing aggrieved persons to secure a full hearing before the Insurance Commissioner (with the opportunity for review by the Commonwealth Court) *after* the rates took effect[8] was adequate. Noting the preference for procedural protections *before* government action, when the citizen's burden of persuasion usually is lower and before the citizen suffers an infringement during the time required for a successful challenge, the Court held:

---

[8] Section 654 of the Insurance Company Law of 1921, Act of May 17, 1921, *as amended,* 40 P.S. §814.

> Thus, procedural protection should be given before the government takes action which threatens to deprive a citizen of an interest, unless important governmental interests, or the preservation of the interests of others, require otherwise, See Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

*Id.* at 451-52, 370 A.2d at 692.

Under the circumstances of that case, the Court concluded that due process required that the coal companies be given notice of the rate proposals and a reasonable opportunity to present *written* reasons why the rate increases should not be allowed or why a hearing should be held before the rates became effective. The Court did not believe that due process necessarily required a full hearing, allowing for confrontation and cross-examination of witnesses:[9]

> While oral proceedings may be necessary for determinations likely to turn on witness credibility, written submissions may be adequate when economic or statistical questions are at issue. See Matthews v. Eldridge, 424 U.S. 319, 342, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976);

---

[9] In a footnote, the court rejected the association's claim that it was entitled to a hearing before rates could become effective under section 31 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, formerly 71 P.S. §1710.31, repealed by the Act of April 28, 1978, P.L. 202 (substantially reenacted and certified at 2 Pa. C. S. §504), which provided that no adjudication of an agency would be valid as to any party unless the party was afforded reasonable notice of a hearing and an opportunity to be heard, with testimony stenographically recorded and a complete record made of the proceedings. The court noted that section 31 applied to parties, only, and that the association was not named as a party and did not have a right to intervene as a party to rate increase proceedings if the Insurance Commissioner decided to allow proposed rates to be deemed into effect without a hearing.

Friendly, Some Kind of a Hearing, 123 U.Pa.L.Rev. 1267, 1281-85 (1975). Moreover, unlike the opportunity to present written objections, a full hearing would entail extended delay, during which time the insurance carriers' may be deprived of their interest in receiving adequate premiums. The opportunity to recover any excessive rates paid, after proceedings pursuant to 40 P.S. §814 (Supp. 1976), in addition to notice and an opportunity to present written objections before the rates become effective, satisfies procedural due process.

*Id.* at 454, 370 A.2d at 693-94.

Finally, in *Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission*, 501 Pa. 71, 459 A.2d 1218 (1982), the Court upheld against a due process challenge an approval by the PUC of an increase in an electric utility's rates pursuant to section 1307 of the Public Utility Code, 66 Pa. C. S. §1307, which provides for automatic adjustment of rates to reflect a utility's fuel cost increases (the ECR), calculated by a statutorily-prescribed formula, without a prior hearing. The Court readily agreed that the rate increases to the complaining industrial customer, approximately $10,000 per day, constituted a substantial property interest, but the majority found a countervailing interest in the need for a public utility to receive a fair return on its property to assure its continued financial integrity and hence its ability to provide efficient, dependable service.

The Court concluded that a combination of factors present in the statutory scheme adequately protected the due process rights of customers without providing the opportunity for a hearing before the increases at issue took effect. Chief among those factors was the provision in section 1307(e) of the statute for an automatic year-end hearing, allowing full participation by all inter-

ested parties, to determine whether ECR amounts collected by the utility during the year were "excessive" and requiring refunds (with interest calculated at the prevailing rate) for amounts determined to be such. *Allegheny Ludlum,* 501 Pa. at 77, 459 A.2d at 1221.[10] The Court noted that the provision for a year-end hearing contrasted with the situation in *Conestoga,* where protesting banks were not afforded an opportunity to be heard either before or after the administrative determination, which was not merely provisional, but final. Further, because the PUC's power to approve an increase in ECR rates was restricted by legislative guidelines (*i.e.,* the statutory formula for calculating ECR), the

---

[10] The year-end proceeding appears to be designed principally for the purpose of reconciling the utility's ECR collections, made pursuant to projections, with its actual fuel expenses. *See* section 1307(e)(1), relating to the contents of reports to be filed by utilities. However, the proceeding appears to allow for the litigation of issues relating to the *propriety* of amounts collected under the ECR as well. Section 1307(c) states that the fuel cost used in computing the adjustment shall be limited to the cost of fuel delivered to a generating site at which it is to be consumed, without reference to the prudency of the fuel purchase. Nevertheless, section 1307(a) requires that the automatic adjustment "provide a just and reasonable return on the fair value of the property used and useful in the public service, to be determined upon such equitable or reasonable basis as shall provide such fair return." The provision requiring commission audits of utilities that use the ECR states that the audits "shall enable the commission to determine the *propriety* and correctness of amounts billed and collected under this section." Section 1307(d) (emphasis added). Finally, the section describing the public hearing itself states that the subject matter encompasses both the substance of the section 1307(e)(1) report "*and any matters pertaining to the use by such public utility of such automatic adjustment clause in the preceding period . . . .*" Section 1307(e)(2) (emphasis added). Thus, if customers sought to challenge not the utility's projections or its computations, but rather the utility's allegedly buying more expensive fuel when less expensive fuel was available, they apparently could do so in the year-end proceeding.

rate increases were not analogous to those proposed without public oversight by the private industry group in *Pennsylvania Coal*. Because the commission had to act affirmatively to approve the increase, the *Pennsylvania Coal* problem of rates being deemed into effect without assurances of administrative examination was not present.

Applying analyses from these cases to the present case, we conclude, first, that substantial property interests are involved here. If the contract between West Penn and MEI provided only for payment of *energy costs*, then the contract could not have the effect of increasing customers' bills, and this case very likely would not be before us. If customers' bills do not change, they have no money at risk, and presumably they have no other interest in whether their utility pays given energy costs to a fuel supplier or to a QF.[11]

However, because of the length of the term of this contract and its legally enforceable guarantees of delivery of power, the contract provides for *capacity* payments as well as energy payments. Because West Penn will begin making capacity cost credit payments before the time when the capacity is actually needed, which West Penn projects to be in 1995, pass-through of these payments to West Penn's customers will result, at least in the near term, in substantial increases in their bills unrelated to their current consumption of power—a substantial property interest.[12] Additionally, even if West Penn had no contract with a QF, West Penn's customers would have a substantial property interest in assuring that future capacity charges to them for construction by West Penn itself were properly justified and cal-

---

[11] No party in this case has raised a claim that this contract's method for calculating energy costs is not just and reasonable.

[12] Armco/Allegheny avers that West Penn's capacity cost payments to MEI will amount to $10.56 million per year.

culated. We see no reason to disregard that interest because the capacity charges are to be assessed sooner rather than later.

Second, we conclude that the commission's action, in declaring that the terms of the contract are in the public interest and that West Penn may recover payments to MEI under the contract, was adjudicatory in nature. All parties to the present case recognize that the effect of the commission's order was to adjudicate rights of MEI, West Penn and West Penn's customers in relation to this contract.

Because the commission's action was adjudicatory in nature and involved substantial property rights of West Penn's customers, those customers must be afforded due process, and the question remains that of what process is due. As the cases discussed above indicate, the essential elements of due process are notice of government action and an opportunity to be heard to challenge that action, although the timing of provision of these safeguards may vary depending on circumstances.

We note first that the present situation is different from that in *Allegheny Ludlum* in one crucial respect. The commission's final approval of West Penn's recovery of payments under the MEI contract from its ratepayers means that that recovery is *not* subject to the same type of year-end review provided in section 1307(e) regarding amounts the utility collects pursuant to the ECR. The commission's order here includes a declaration (*i.e.*, a declaratory judgment) that the terms of the contract are in the public interest and that West Penn is authorized to recover its expenses under the contract from its ratepayers. That declaration approves capacity cost payments from West Penn to MEI at a rate of 3.3 cents per kilowatt hour for the entire thirty-year term of the contract. As West Penn correctly perceives, all persons with notice of the commission's action and an opportu-

nity to be heard regarding it would be precluded from raising the issue of the legality of the contract terms or West Penn's right to recover contract expenses by West Penn in any future proceeding. Even though the commission approved recovery of these expenses through the mechanism of the ECR (because the ECR is the only method of recovery that provides a dollar-for-dollar matching of utility payments with recovery from ratepayers, *see AES Beaver Valley, Inc. v. West Penn Power Co.*). (Docket No. C-844022, order entered March 13, 1985, slip. op. at 12) the preclusive effect of the commission's declaration means that the year-end review provisions of section 1307(e) will not apply to this recovery, at least not to the extent of permitting challenges to the *propriety* of the 3.3 cents per kilowatt hour capacity rate. Therefore, the present situation is not analogous to that in *Allegheny Ludlum.*

Next for consideration is *Pennsylvania Coal.* The Public Utility Code contains provisions, analogous to section 654 of the Insurance Company Law of 1921, allowing any person to complain to the commission with regard to any regulation or order of the commission that the complainant is required to observe, and providing for a public hearing on such complaints, with notice and the making of a full and complete record. 66 Pa. C. S. §§701-703. In addition, customers' questions concerning the utility's cost data and the commission's calculation of capacity cost credit, along with the commission's underlying assumptions, are the same sort of economic and statistical issues that the Court in *Pennsylvania Coal* held to be able to be considered on the basis of written submissions.

However, again there is a distinction. In *Pennsylvania Coal* the Court held that notice and the opportunity to present written objections before proposed *insurance* rates were deemed into effect by virtue of the Insur-

ance Commissioner's inaction were adequate due process protections when coupled with the opportunity to challenge the rates later in a full hearing before the Insurance Commissioner pursuant to section 814. In other words, the Court did not view the deeming of rates into effect as a final, affirmative approval of those rates by the Insurance Department, not subject to later challenge. By contrast, in the present case, final affirmative approval is precisely what West Penn sought, and received, from the PUC. If the commission's order is affirmed by the courts, then the propriety of the contract's capacity cost credit rate will not be subject to later challenge in a complaint proceeding before the commission under section 701; that issue will have been fully adjudicated already in these proceedings. Therefore, the present circumstances are not analogous to those in *Pennsylvania Coal.*

Ultimately, then, the present circumstances are closest to those in *Conestoga.* Unless notice and an opportunity to be heard on the issue of the propriety of the contract rates are provided *before* final PUC approval of the terms of a contract between a utility and a QF, they will not be provided at all.

We disagree with West Penn's contention in its appeal that the due process rights of its customers would be protected adequately by a procedure involving publication of the commission's decision in the *Pennsylvania Bulletin* followed by a thirty-day period in which interested persons might submit written comments on the decision. First, such a procedure would needlessly postpone the customers' opportunity to challenge the proposed action until after the commission had formulated a decision on the matter and had a stake in preserving that decision. Unlike the circumstances involving current utility fuel expenses present in *Allegheny Ludlum,* the utility here is not now incurring ex-

penses that it must recover immediately in order to preserve its financial health. Here no obligations arise until the PUC approves the contract. Second, such a procedure would allow only written submissions, without any later opportunity for a full hearing, as in *Pennsylvania Coal*.

In our view, due process requires that, before the PUC may issue a declaration approving the legality of the terms and conditions of a contract for a utility's purchase of power from a QF that includes payments for capacity, the utility's customers must be provided with notice of the proceedings and an opportunity to be heard to challenge the proposed action.

The only question remaining, regarding the opportunity to be heard, is whether the procedure adopted must take the form of a full, trial-type hearing.

In *American Paper Institute* the United States Supreme Court quoted from the Congressional Conference Report on PURPA in support of the Court's determination that Congress did not intend to impose traditional ratemaking concepts on sales by qualifying facilities to utilities:

'The conferees recognize that cogenerators and small power producers are different from electric utilities, not being guaranteed a rate of return on their activities generally . . . .

[C]ogeneration is to be encouraged under this section and therefore the examination of the level of rates which should apply to the purchase by the utility of the cogenerator's or small power producer's power should not be burdened by the same examination as are utility rate applications, but rather in a less burdensome manner. The establishment of utility type regulation over them would act as a significant disincentive to firms interested in cogeneration and small power production.'

*American Paper Institute,* 461 U.S. at 414 (quoting H.R. Conf. Rep. No. 95-1750, 95th Cong., 2d Sess. at 97-98 (1978)). *Conestoga* itself approved the use of proceedings of less formality than a full trial-type adversary hearing.

Given the federal and state policy of encouraging the development of cogeneration and small power production, in part by minimizing the burdens involved in the examination of rates of purchases of power by utilities from QFs, the commission must devise a procedure that provides the essential elements of a hearing, but allows for consideration of petitions of the type involved here in as expeditious and minimally burdensome a manner as possible. The commission should make its own calculations of the maximum allowable capacity cost credit part of the record of the proceedings, and it should provide access to its calculations to interested parties before the hearing.[13]

Finally, we must consider the issue of the manner of notice that is necessary to assure that the hearing the commission provides adequately protects the due pro-

---

[13] The commission initiated a generic investigation and reexamination of its regulations implementing section 210 of PURPA by order entered April 10, 1987, at Docket No. I-860025, *Investigation Upon the Commission's Own Motion Into the Regulations at 52 Pa. Code §57.31 et seq.,* in order that the commission might, possibly, revise its regulations in light of the experience it has gained since their adoption. The commission takes the position that any amendments to its regulations resulting from that investigation would apply prospectively, only, and would not affect existing agreements between utilities and QFs. Although we agree with that proposition, we note that no contract exists yet between West Penn and MEI because the condition precedent of a commission order approving the terms of the contract, final beyond appeal, has not been satisfied. Should the commission's investigation result in the adoption of procedures consistent with this opinion before the commission reconsiders this case on remand, application of those procedures to the reconsideration of this contract would be proper.

cess rights of West Penn's customers. The commission's regulations grant the commission broad discretion in prescribing the form of notice appropriate for the type of rate increase involved here:

> For other proposed changes in rates [those that do not constitute a 'general rate increase' within the meaning of 66 Pa. C. S. §1308(d) (relating to voluntary changes in rates)], *rules and regulations, including but not limited to, nongeneral rate increases, proposed changes in regulations—without rate changes—and proposed rate changes under 66 Pa. C. S. §1307(f) (relating to sliding scale of rates; adjustments), public notice of the proposed changes shall be given in a manner directed by the Commission.*

52 Pa. Code §53.45(c). The commission's regulations relating to notice procedures for general rate increases, contained in 52 Pa. Code §53.45(a), require a utility to *post notice of proposed increases in company offices,* §53.45(a)(1), to issue news releases on the date the increase is filed, §53.45(a)(3), and to mail or to hand deliver a written or printed notice to each ratepayer, §53.45(a)(2). In lieu of the mailing or hand delivery method, "a public utility on a 1-month billing cycle filing a proposed general rate increase in excess of $1 million may notify its customers by means of a bill insert." §53.45(a)(4).

West Penn's suggested manner of providing notice —publication of a commission order in the *Pennsylvania Bulletin*—is not adequate under the circumstances of this case. As Armco/Allegheny argues, this nongeneral rate increase in excess of $10 million should be subject to notice procedures at least as thorough as those required for a general rate increase of $1 million.

In order to guarantee fulfillment of the requirements of due process in this case, the commission

should require West Penn to provide notice to its customers in a manner consistent with that prescribed in 52 Pa. Code §53.45(a), allowing for bill inserts in lieu of mailed or hand delivered individual notices.

## B.  Excess Capacity

The sole contention of the Office of Consumer Advocate in its petition at No. 2418 C.D. 1987 is' that, on both due process and statutory grounds, the PUC cannot issue an order declaring that the 43 megawatts of new electric generating capacity from the Milesburg project must be totally ignored in all rate cases over the next thirty years for the purpose of determining whether West Penn has excess capacity. The fourth ordering paragraph of the commission's order is as follows:

> 4.  [T]he Commission hereby declares that the additional generating capacity as a result of the contract between West Penn Power Company and Milesburg Energy, Inc., referenced in Ordering Paragraph No. 1, above, shall not be considered by the Commission in determining the reserve margins or economic benefits resulting from any base load or other generating unit during the terms [sic] of the contract.

Arguing on the basis of the *Conestoga* line of cases, discussed above, OCA contends that this ordering paragraph violates the due process rights of West Penn's ratepayers in that, by precluding the commission from considering this capacity as to the excess capacity analysis in any West Penn rate case until the year 2020, the order deprives parties to such future rate cases of notice and an opportunity to be heard on the issue of the effect of this capacity on West Penn's overall capacity.

The commission essentially has conceded OCA's due process argument to the extent that it relates to *future* excess capacity determinations involving facilities that

West Penn has not yet built. The commission now disavows any intent to preclude consideration of the Milesburg unit capacity during the entire term of the contract, noting that West Penn's petition requested only an order stating that the addition of the MEI capacity does not result in excess capacity as to the MEI capacity itself or as to any *existing* West Penn capacity.

Further, the commission notes that the body of the order stated that the relief requested by West Penn was consistent with the commission's current thinking as expressed in the proposed "Policy Statement on the Treatment of Qualifying Facilities in Excess Capacity Determinations" (Policy Statement).[14] The proposed Policy Statement declares that in most cases excluding QF capacity from excess capacity calculations pursuant to section 1323 of the Public Utility Code, 66 Pa. C. S. §1323, is appropriate and consistent with legislative intent, but that this principle does not apply where a utility purchases firm, long-term QF capacity and then later fails to defer or to cancel planned construction of its own generating capacity that the QF purchase should have enabled the utility to avoid.

OCA, in its reply brief, characterizes the commission's restrictive interpretation as a significant improvement over the original order. Nevertheless, OCA repeats its due process objection to the commission's exclusion of the MEI capacity from excess capacity determination involving only West Penn's *existing* capacity.

Under the *Conestoga* line of cases, OCA's position is correct. First, the commission's decision to disregard

---

[14] The policy statement, proposed to be added to the PUC's regulations implementing PURPA at 52 Pa. Code §57.40, was published in the *Pennsylvania Bulletin* for public comment, along with an order explaining the reasons for the policy, on July 18, 1987. 17 Pa. B. 3035. At this writing, the commission has not adopted the proposed regulation.

the Milesburg project capacity involved substantial property interests. Second, under the circumstances of this case, the commission's action was adjudicatory in nature. The definition of "adjudication" is provided in 2 Pa. C. S. §101:

> Any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made.

The commission's order here was a final order affecting property interests and rights of ratepayers. The commission cannot rely on the proposed, but unadopted, Policy Statement as a reflection of the commission's "current thinking" in order to justify depriving ratepayers of notice and an opportunity to be heard on the issue of the relation of this QF capacity to West Penn's overall capacity.

The situtation might be different if the commission had adopted the Policy Statement as a regulation, thereby giving the Policy Statement the force and effect of law. In that case the commission's *legislative* action (with its own attendant procedures) in implementing a policy decision by adopting the Policy Statement would have *altered* ratepayers' rights on this issue. Therefore, the commission's order on a petition such as West Penn's, although final, would not be the administrative action that affected ratepayers' rights.

However, because the commission has not adopted the Policy Statement, the commission's order *in this case* is the administrative action that affects the ratepayers' rights regarding the excess capacity treatment of the Milesburg project capacity, and hence is adjudicatory in nature. This conclusion does not mean that the commission does not have the power to decide to disre-

gard the Milesburg project capacity in excess capacity determinations involving West Penn's existing capacity, but rather that the commission may not make such a decision without first providing the ratepayers with notice and a hearing. Accordingly, in the commission's proceeding on remand, the commission should afford ratepayers the opportunity to be heard on that issue also.

Because the commission decided to disregard the Milesburg project capacity without providing ratepayers due process of law, we are remanding for the commission to reconsider its decision after providing due process for constitutional reasons. For that reason, OCA's statutory basis for attacking the commission's decision—the claim that section 1323 of the Public Utility Code, 66 Pa. C. S. §1323, precludes the commission from disregarding capacity except in narrowly defined circumstances not applicable here—is not yet ripe for adjudication.

## C. Levelized Capacity Payments

Armco/Allegheny also contends that the provision for levelized capacity payments in the contract between West Penn and MEI violates federal and state law. First Armco/Allegheny asserts that the prohibition in section 210(b) of PURPA against a rate greater than the incremental cost to the utility of alternative electric energy, taken together with FERC's rule stating that nothing in its regulations requires a utility to pay more than avoided cost for purchases, 18 C.F.R. §292.304(a)(2), means that a utility may not make front-end loaded levelized capacity payments to a QF, because such payments would exceed the actual FAC in the early years of a contract.

This argument fails to account for 18 C.F.R. §292.304(b)(5), which provides:

In the case in which rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery.

In the preamble to its February 25, 1980, rulemaking, FERC explained the rationale behind this rule in part as follows:

A facility which enters into a long term contract to provide energy or capacity to a utility may wish to receive a greater percentage of the total purchase price during the beginning of the obligation. For example, a level payment schedule from the utility to the qualifying facility may be used to match more closely the schedule of debt service of the facility. So long as the total payment over the duration of the contract does not exceed the estimated avoided costs, nothing in these rules would prohibit a State regulatory authority or non-regulated electric utility from approving such an arrangement.

45 Fed. Reg. 12224. Contrary to Armco/Allegheny's assertion in its reply brief, this regulation, as explained by the preamble, is not ambiguous. Federal law encourages, rather than prohibits, levelized capacity payments.

Next Armco/Allegheny asserts that the levelized capacity payments to MEI violate section 1323 of the Public Utility Code[15] because, until such time as the

---

[15] Section 1323, added to the Public Utility Code by section 9 of Act 114, Act of July 10, 1986, P.L. 1238, provides in part as follows:

(a) **Excess capacity costs.**—Whenever a public utility claims the costs of an electric generating unit in its rates for the first time and the commission finds that the unit

capacity is actualy needed, which is projected to be in the fourth quarter of 1995, the levelized payments will be for capacity that is excess. A determination of this issue necessarily is bound up with the decision of the commission on remand regarding whether the commis-

results in the utility having excess capacity, the commission shall disallow from the utility's rates, in the same proportion as found to be excess capacity:

(1) the return on specific unit or units of any excess generating reserve;

(2) the return on the average net original cost per megawatt of the utility's generating capacity; or

(3) the equity investment in the new unit.

In addition to the disallowances set forth in this subsection, the commission may disallow any other costs of the unit or units which the commission deems appropriate. For the purposes of this section, a rebuttable presumption is created that a unit or units or portion thereof shall be determined to be excess unless found to be needed to meet the utility's customer demand plus a reasonable reserve margin in the test year or the year following the test year, or, if it is a base load unit, it is also found to produce annual economic benefits which will exceed the total annual cost of the plant during the test year or within a reasonable period following the test year.

. . . .

c) **Other powers and duties preserved.**—This section shall not be construed to diminish the powers and duties of the commission under any other provision of law to reduce rates because of excess capacity or any other reason, provided that, in determining whether a base load unit, which was in commercial operation for at least one year prior to the effective date of this section [before July 10, 1985], results in a public utility having excess capacity, cogeneration, for which an agreement has been entered into by the public utility within three years after the in-service date of the base load unit, shall not be considered by the commission in determining reserve margins or economic benefits resulting from the base load unit for the first five years after the date of the cogeneration agreement.

sion should exclude the Milesburg project capacity from excess capacity determinations involving only West Penn's existing capacity. If, after providing notice and a hearing on remand on the excess capacity issue, the commission lawfully decides to disregard the Milesburg project capacity, then this argument will be answered as well. Capacity that is lawfully disregarded is not excess.

This conclusion is entirely consistent with the overall thrust of section 210 of PURPA, which was to encourage the development of alternative power sources immediately, in order to wean the nation from foreign oil and natural gas as quickly as possible. FERC's explanation of its regulation requiring capacity payments as well as energy payments to QFs, where appropriate, *see* n.4, *supra,* indicates that if a utility had excess capacity, and would continue to have excess capacity from its own already-existing resources through the term of a contract with a QF, then no capacity payment would be appropriate, because the utility would not be avoiding any capacity costs by virtue of the purchase. Nevertheless, PURPA would still compel the utility to purchase power from the QF, paying only energy costs.[16] However, where, as here, the capacity offered by the QF definitely will be needed by the utility during the term of the contract, the purchase does permit the utility to avoid some future capacity costs. The levelization of these avoided capacity payments to a QF over a period beginning before the date when the capacity is actually needed does not violate section 1323.

---

[16] The apparent inefficiency of such compelled purchases should be greatly alleviated by PURPA's encouragement of the practice of "wheeling" electricity, that is, of transmitting the power through the lines of an interconnecting utility that does not need the power to another utility that does. *See* 18 C.F.R. §292.303(d) *and* 45 Fed. Reg. 12219.

Armco/Allegheny also argues that levelized capacity payments violate the "spirit" of section 1315 of the Public Utility Code, 66 Pa. C. S. §1315, which prohibits rate recovery by a utility for expenses it incurs for construction work in progress that the utility has undertaken on a base load unit until such time as the unit is "used and useful" to the utility's customers, which is deemed to be when the unit is presently providing actual utility service to them. By arguing that the Milesburg project energy will not be used and useful to West Penn's customers until 1995, when the capacity is first needed, Armco/Allegheny confuses the section 1315 concept of actual delivery of power with the section 1323 concept of excess capacity. The contract between West Penn and MEI in fact incorporates the used and useful concept of section 1315 by providing that West Penn will not make payments to MEI until the Milesburg project actually delivers power to West Penn. [17]

### Conclusion

Accordingly, an appropriate remanding order follows.

---

[17] Armco/Allegheny raises two other issues that are irrelevant to these proceedings. The claim that the proceeds of the sale of the Milesburg Power Station to MEI should be distributed to West Penn's ratepayers, rather than to its shareholders, may be an appropriate issue in West Penn's next general rate case; however, that issue has no bearing on whether this agreement and its purchase rates are proper. Similarly, Armco/Allegheny's claim that the agreed purchase rate is not "just and reasonable" because the Allegheny Power System, of which West Penn is a member, has recently agreed to sell power to an electric power cooperative in Virginia for seven years at a rate substantially below that involved in this contract simply does not relate to the question of whether the rate negotiated with MEI is equal to or below FAC.

ORDER

NOW, August 22, 1988, the order of the Pennsylvania Public Utility Commission at Docket No. P-870216, entered September 22, 1987, is hereby vacated. We remand this matter for the commission to reconsider (1) its declaration that the terms of the proposed contract between West Penn Power Company and Milesburg Energy, Inc., including the capacity cost credit rate specified in the contract, are in the public interest and (2) its declaration that the commission will not consider the capacity from the Milesburg project in excess capacity determinations, after providing West Penn's ratepayers with notice and an opportunity to be heard on these issues in a manner consistent with the foregoing opinion.

Jurisdiction relinquished.

---

OPINION BY JUDGE CRAIG, November 3, 1988:

Upon consideration of Petition for Reargument filed on behalf of the Pennsylvania Public Utility Commission (PUC) and the answers to that petition, the court concludes that the only new matter raised is the request for a declaration that the opinion and order of this court, dated August 22, 1988, shall have prospective effect, rather than retroactive effect. In the course of the principle briefing and argument of the case, there was no request from any party for such a declaration, either by way of alternative relief or by way of modification of relief which might be granted.

In view of the questions of first impression involved in this case, the resolution of which could not have been clearly foreshadowed, this court's intention is that the decision shall have only prospective effect. *Chevron Oil Company v. Huson,* 404 U.S. 97 (1971).

Therefore, the court declares that the decision in this case, dated August 22, 1988, shall not have retroactive effect, but shall be applicable only to the petition for approval of the proposed contract in this case, between West Penn Power Company and Milesburg Energy, Inc., and to any petitions filed with the PUC after August 22, 1988 for approval of contracts covered by the Federal Public Utility Regulatory Policies Act of 1978.

The petition for reargument shall in other respects be denied.

## ORDER

NOW, November 3, 1988, upon consideration of petition for reargument on behalf of the Pennsylvania Public Utility Commission and answers thereto, a declaration of prospective effect of this court's decision is hereby adopted as stated in the foregoing opinion, and the petition for reargument in other respects is denied.