563 A.2d 557

**LEHIGH VALLEY POWER COMMITTEE et al., Petitioners,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 5, 1989.

Decided Aug. 7, 1989.

David M. Kleppinger, with him, Richard S. Kahlbaugh, McNees, Wallace & Nurick, Harrisburg, for petitioners.

Lee E. Morrison, Asst. Counsel, with him, Billie E. Ramsey, Asst. Counsel, Bohdan R. Pankiw, Deputy Chief Counsel, and Daniel P. Delaney, Chief Counsel, Harrisburg, for respondent.

Douglas G. Robinson, with him, Glenn J. Berger, and Matthew W.S. Estes, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., Bernard Ryan, Jr., Dechert, Price & Rhoads, Harrisburg, and Charles A. Bowes, Jr., Air Products and Chemicals, Ins., Allentown, for intervenor, American REF–FUEL Co., of Lehigh Valley.

David B. MacGregor, with him, Paul R. Bonney, Morgan, Lewis & Bockius, Philadelphia, and Paul E. Russell, with him, David J. Dulick, Allentown, for intervenor, Pennsylvania Power & Light Co.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, COLINS, PALLADINO, McGINLEY and SMITH, JJ.

CRAIG, Judge.

The Lehigh Valley Power Committee (LVPC), an ad hoc association of industrial customers of Pennsylvania Power and Light Company (PP & L or the utility), appeals from an order of the Pennsylvania Public Utility Commission (PUC or the commission) that granted a petition by PP & L for rate recognition, that is, full immediate recovery from ratepayers through PP & L's retail rates, of the cost of power that PP & L intends to purchase from American REF-FUEL Company of Lehigh Valley (REF-FUEL). REF-FUEL plans to build a 32 megawatt (Mw) small power production facility near Bethlehem, Pennsylvania, to be fueled by municipal solid waste and sludge from municipalities in and around the Lehigh Valley area. The Federal Energy Regulatory Commission (FERC) has certified the project[1] as a "qualifying facility" (QF) under the terms of sections 201 and 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA).[2]

The principal issue involved in this appeal is whether the PUC violated LVPC's right to due process of law by approv-

---

1. *American REF-FUEL Company of Lehigh Valley,* Docket No. QF86-289-000, 34 F.E.R.C. (CCH) ¶ 62,239 (January 28, 1986) (order granting application for certification); Docket No. QF86-289-001 43 F.E.R.C. (CCH) ¶ 62,144 (May 6, 1988) (order granting application for recertification).

2. Pub.L. No. 95-617, 92 Stat. 3117 (1978), 16 U.S.C. §§ 796 and 824a-3. For a discussion of the public policy objectives Congress sought to promote in enacting PURPA, the promulgation of regulations by FERC implementing PURPA and the promulgation of regulations by the PUC implementing the federal regulations and policies, see this court's recent decision in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa. Commonwealth Ct. 81, 546 A.2d 1296 (1988) (*Milesburg* ).

ing pass-through to ratepayers (in retail rates) of PP & L's costs for the purchase of power from REF–FUEL without holding a hearing to determine the justness and reasonableness of the utility's current recovery of the full amount of its payments to REF–FUEL, where the contract rate under which PP & L is to incur those costs incorporates a tariff rate previously approved by the commission that is a levelized rate, and the commission and PP & L concede that payments under that levelized rate will exceed the utility's actual avoided costs during the early part of the term of the contract.[3]

*PP & L's Pioneer Rate and the REF–FUEL Purchase Agreement*

In 1981, before the PUC's adoption of its regulations implementing the FERC rules, the commission approved, in a formal rate proceeding, a so-called "Pioneer Rate" for PP & L purchases of power from QF's using biomass or municipal solid waste or renewable resources such as solar, wind or small hydro as the fuel source. *Supplement No. 79 to Tariff Electric Pa. P.U.C. No. 198*, Docket No. R–811515 (May 26, 1981). The Pioneer Rate provided for payments to eligible facilities at $.06 per kilowatt hour (Kwh) or at the calendar year weighted average value of PP & L's interchange energy sales and purchases, when such value exceeded $.06/Kwh. That rate has remained in effect until the present, although the commission recently approved, with certain modifications, PP & L's request to curtail the period for eligibility for that rate, in accordance with PP & L's desire to phase out the rate. *Supplement No. 15 to Tariff Electric Pa. P.U.C. No. 200*, Docket No. R–880956 (May 27, 1988).

On March 4, 1988, PP & L filed a petition with the PUC requesting rate recognition of purchased power costs result-

3. Our scope of review of a decision of the PUC is limited to a determination of whether constitutional rights have been violated, error of law committed or whether the commission's findings, determinations or order is supported by substantial evidence. *SME Bessemer Cement, Inc. v. Pennsylvania Public Utility Commission*, 116 Pa.Commonwealth Ct. 13, 540 A.2d 1006 (1988).

ing from an agreement executed between PP & L and REF–FUEL on February 11, 1988, for the wholesale sale of electric energy. The parties conditioned the agreement on PUC approval for PP & L to recover, on a current basis through the mechanism of the Energy Cost Rate (ECR), all amounts paid to REF–FUEL. The contract rate, i.e., the payment obligation of PP & L to the QF, is a combination of the Pioneer Rate and an alternative percentage of actual avoided costs, as follows:

> For the years 1988 and 1989 PP & L will purchase energy at 6.0 cents ($.06) per KWH or at the calendar year weighted average value of PP & L's interchange energy sales and purchases when such rate exceeds 6.0¢/KWH. For each of the next seven years starting on January 1, 1990, the rate paid will be at 6.0¢/KWH or 75% of PP & L's actual Energy–Only Avoided Cost for that month, whichever is higher. Thereafter, the rate paid will be 6.0 cents ($.06) per KWH or a rate calculated at 85% of the actual Energy–Only Avoided Cost for that month, whichever is higher.

LVPC filed a petition to intervene and an answer in opposition to PP & L's petition, requesting that the commission "limit PP & L's current recovery of payments made to American REF–FUEL to PP & L's current avoided costs until a later date when those costs begin to exceed the payments to American REF–FUEL." R. 134a.[4] PP & L and REF–FUEL filed responses to LVPC's answer. The Lehigh Valley Solid Waste Authority, an entity with a contract with REF–FUEL for the disposal of 200,000 tons of waste a year at the proposed facility, filed a petition to intervene and a response supporting PP & L's petition.

---

**4.** As the PUC notes in its brief, this was the same relief LVPC requested in two other proceedings before the commission, *Joint Petition of Pennsylvania Power & Light Company and Specified Cogeneration and Small Power Production Facilities for a Declaratory Order,* 61 Pa.P.U.C. 577 (1986) (*Joint Petition*) and *Lehigh Valley Power Committee v. Pennsylvania Power & Light Co.,* Docket No. R–870878C001 (April 5, 1988), *aff'd, Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa. Commonwealth Ct. 259, 563 A.2d 548 (1989).

The responses contended: that LVPC's position opposing current ECR recovery was contrary to federal and state law; that LVPC had no right to force the utility to prove the justness and reasonableness of a contract rate agreed upon pursuant to an existing, previously approved tariff; that an earlier commission decision in the case of *Collection of Amounts Paid for Energy Purchases from Bethlehem Steel Corporation from PP & L Ratepayers* Docket No. P–850039 (June 25, 1985) (*Bethlehem Steel*), expressly approving ECR recovery of higher early-year payments to qualifying facilities under the Pioneer Rate contained in PP & L's tariff, had already resolved the issue raised by LVPC, and LVPC had alleged no changed circumstances or other reasons to justify departure from the commission's precedent on this point; and that LVPC was attempting erroneously to compare payments to be made no earlier than 1991 with avoided costs in 1988.

The PUC granted PP & L's petition for approval of current rate recovery, stating that it previously had addressed the exact issue presented in the proceeding—whether PP & L should be required to demonstrate that payments it would make under the Pioneer Rate would be less than actual avoided cost over the contract period—in the *Bethlehem Steel* case, from which the commission quoted as follows:

'We think PP & L's request for this relief somewhat redundant, since we previously approved the Pioneer Rate Tariff which, as noted above, is the precise basis for the payments made to [Bethlehem Steel]. Having approved this tariff, it would be unconscionable for us to suggest that rates thus established could be unjust and unreasonable and *a fortiori* we think implicit in our approval of the tariff our approval also of collection of such amounts from ratepayers. Nonetheless, we recognize that we have not previously *explicitly* approved the collection of such amounts from ratepayers. We take this opportunity to do so and trust this Order will finally resolve any questions concerning such rate collections. The basis for

both our approval of the Pioneer Rate and allowance of ECR recovery is that ratepayers will receive significant benefits from such transactions. If the price for such purchases is at or below the cost for purchasing or generating energy a utility would otherwise incur, ratepayers can suffer no "cost disadvantage." This is true even if such prices are at times higher than utility costs, if over all the costs are no higher. Additionally, such alternative energy sources offer the advantages of greater system diversity, smaller capacity addition increments, better load management, closer match of capacity additions to load growth projections, less utility capital at risk, dual utilization of limited resources, renewable resources or waste products, and attaining other social and environmental goals (trash burning, etc.).'

*Petition of Pennsylvania Power & Light Company for Rate Recognition of Power Purchased from American Ref-Fuel Company of Lehigh Valley*, Docket No. P–880294 (June 9, 1988), slip op. at 3 (quoting *Bethlehem Steel*, Docket No. P–850039 (June 25, 1985), slip op. at 2). The commission viewed its reasoning in *Bethlehem Steel* as being determinative of the issue before it. In addition, the commission noted that a QF meeting the eligibility criteria for the Pioneer Rate was entitled to that rate as a matter of law:

It is well established that tariffs have the force and effect of law. See, e.g., *Brockway Glass v. Pa. P.U.C.*, 63 Pa. Commonwealth Ct. 238, 437 A.2d 1067 (1982) [1981]; *Stiteler v. Bell Telephone*, 32 Pa.Commonwealth Ct. 319, 379 A.2d 339 (1977). *Therefore, if LVPC is concerned that the Pioneer Rate of six cents per kwh set forth in PP & L's Tariff Rule 6E is excessive, its remedy would be to file an independent complaint or a petition with the Commission seeking a prospective change to PP & L's tariff pursuant to 66 Pa.C.S. § 1309.* Absent a change in Tariff Rule 6E, the justness reasonableness and lawfulness of amounts paid pursuant thereto is conclusive, and the evidentiary hearing requested by LVPC

in the instant proceeding would not serve any legitimate purpose. (Emphasis added.)

*Id.* at 4. As for the propriety of the alternative purchase price in the later years of the contract, 75% of the PP & L's actual energy-only avoided cost in years three through ten and 85% of those costs in years eleven through twenty, whenever such amounts were higher than $.06/Kwh, the PUC noted that it had held consistently that rates at or below avoided costs as defined in its regulations are per se reasonable and automatically recoverable.

Finally, regarding LVPC's request that the Commission permit deferral of rate recovery of the full contract price, the PUC noted that it had consistently rejected arguments against levelization of rates paid to QFs based on claims that such rates are unjust and unreasonable when amounts paid to the QF and collected on a current basis from ratepayers exceeded the utility's actual avoided costs during the early years of a contract. The commission noted that such levelization was approved both by the federal regulations and the commission's regulations relating to purchases of energy only. LVPC has timely appealed the commission's order.

*Rate Levelization and Due Process of Law*

When FERC adopted regulations implementing PURPA, codified at 18 C.F.R. §§ 292.101–292.602, the agency included regulations requiring utilities compelled to purchase from QFs to pay the full "avoided cost" (FAC) for such purchases, defined as "the incremental costs to the electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6). As an aid in determining what the utilities' avoided costs were, the regulations required utilities to file with the state authorities, and periodically update, detailed cost reports relating to the estimated avoided cost of energy for the current year and each of the succeeding five years and reports relating to plans for construction of capacity, firm power purchases

and retirements of capacity during the succeeding ten years. 18 C.F.R. § 292.302(b).

FERC was acutely aware that the financing requirements of proposed QFs might require reliable, levelized payment schedules. On the question of the matching between payments to QFs and current actual avoided costs, section 292.304 of the regulations, relating to rates for utility purchases of power from QFs, expressly stated:

In the case in which the rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery.

18 C.F.R. § 292.304(b)(5). Section 292.304 further provided:

(d) *Purchases 'as available' or pursuant to a legally enforceable obligation.* Each qualifying facility shall have the option either:

(1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility, be based on either:

(i) The avoided costs calculated at the time of delivery; or

(ii) The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d).

In the Preamble to its February 25, 1980, adoption of the regulations including § 292.304, FERC explained:

Paragraphs (b)(5) and (d) [of § 292.304] are intended to reconcile the requirement that the rates for purchases

equal the utilities' avoided cost with the need for qualifying facilities to be able to enter into contractual commitments based, by necessity, on estimates of future avoided costs. Some of the comments received regarding this section stated that, if the avoided cost of the energy at the time it is supplied is less than the price provided in the contract or obligation, the purchasing utility would be required to pay a rate for purchases that would subsidize the qualifying facility at the expense of the utility's other ratepayers. The Commission recognizes this possibility, but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase. The Commission does not believe that the reference in the statute to the incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long term contracts between qualifying facilities and electric utilities.

Many commenters have stressed the need for certainty with regard to return on investment in new technologies. The Commission agrees with these latter arguments, and believes that, in the long run, 'overestimations' and 'underestimations' of avoided costs will balance out.

. . . .

A facility which enters into a long term contract to provide energy or capacity to a utility may wish to receive a greater percentage of the total purchase price during the beginning of the obligation. For example, a level payment schedule from the utility to the qualifying facility may be used to match more closely the schedule of debt service of the utility. *So long as the total payment over the duration of the contract term does not exceed the estimated avoided costs, nothing in these rules would prohibit a State regulatory authority or non-regulated electric utility from approving such an arrangement.*

45 Fed.Reg. 12214, 12224 (February 25, 1980) (emphasis

added).[5] These federal regulations and explanation demonstrate conclusively that FERC has approved the concept of levelization of payments by utilities to QFs.

LVPC's contention that due process of law requires the PUC to hold a hearing in which PP & L must demonstrate that the amounts to be recovered from ratepayers in relation to its contract with REF–FUEL are just and reasonable is based almost entirely on LVPC's interpretation of this court's recent decision in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296 (1988) (*Milesburg* ). In *Milesburg,* a utility and a small power production facility that was a QF under PURPA privately negotiated an agreement for the purchase of energy and capacity over a thirty-year contract term. The agreement provided for payments for energy based on monthly variables and for payments for capacity at a levelized rate over the entire term of the contract. The parties conditioned their obligations on the existence of a PUC order or regulation, final beyond appeal and published in the *Pennsylvania Bulletin,* approving the terms and conditions of the contract and immediate recovery by the utility of all amounts it paid to the QF through its ECR. The utility sought such an order by means of a petition to the commission, giving notice of its request only to certain large industrial customers that regularly participated in its rate proceedings.

The PUC approved the contract terms, including the purchase rates, without holding a hearing or providing general notice to the utility's ratepayers. No party disputed the reasonableness of the contract formula for calculating the energy purchase rates. Based on its own calculations (not made a part of the record) the PUC concluded that the rate for payments for capacity was below FAC and hence per se reasonable. The commission declined to order publication of its decision in the *Pennsylvania Bulletin*

5. When the PUC promulgated its regulations implementing the federal regulations, it expressly approved payments at levelized rates, at the option of the QF. *See* 52 Pa.Code § 57.34(b)(2).

with a period for filing of written objections, as requested by the utility.

This court reviewed the precedents of the Pennsylvania Supreme Court relating to the requirements of due process of law in the context of administrative proceedings and derived from them a fundamental principle that when agency action is adjudicatory in nature and involves substantial property interests, due process of law requires that those whose interests are affected receive notice of the agency action and an opportunity to challenge that action, generally at a hearing and generally before the administrative action takes place. Because the commission's action in approving the contract terms was tantamount to approving a purchase of capacity by the utility, it was adjudicatory in nature and involved substantial property rights of the utility's ratepayers; therefore, due process requirements applied.

However, the procedure employed by the commission, described above, did not meet those requirements. Accordingly, this court reversed the commission's order and remanded for proceedings adequately protecting the due process rights of ratepayers.

LVPC interprets *Milesburg* as establishing "that the requirements of due process require notice and a hearing in cases involving the approval of rate recovery for all costs associated with the purchase of energy from non-utility generators." Brief for Petitioner, p. 7. However, that interpretation is overly broad, and it fails to consider a variety of factors that distinguish the present circumstances from those present in *Milesburg*.[6]

---

**6.** The PUC and the intervenors note that, in response to a petition for reargument, this court issued a supplemental opinion and order in the *Milesburg* case expressly stating that, because the case presented issues of first impression, the resolution of which could not have been clearly foreshadowed, the decision would be applicable to the proposed contract in that case and prospectively to petitions filed with the commission after August 22, 1988, the date of the *Milesburg* decision, but not retroactively. Therefore, previous PUC approval of contracts precisely analogous to that involved in *Milesburg* was not threatened. Because PP & L filed the petition involved in this case before that date, the PUC and the intervenors contend that the *Miles-*

First and foremost among those distinctions is the fact that the customers in *Milesburg* presented a due process challenge to the contract rate between the utility and the QF. Because that contract rate had been privately negotiated, without reference to any standard having the force of law, the PUC's evaluation of it in the *Milesburg* petition proceeding presented the only opportunity for affected customers to participate in challenging the contract rate and to make sure that the commission's evaluation of it was factually and legally correct. When the PUC failed to provide for notice and a hearing, it deprived the utility's customers of that opportunity. Here, however, as the PUC and the intervenors emphasize, LVPC has *not* claimed that the *contract rate* itself is or may be unjust and unreasonable. Rather, LVPC challenges only the propriety of the commission's approval of current *recovery* from the utility's ratepayers of levelized payments to the QF pursuant to the contract, when those payments exceed the utility's current actual avoided costs.

The commission was entirely correct in pointing out in its order that the justness and reasonableness of the contract rate, incorporating as it does the Pioneer Rate previously approved for inclusion in PP & L's tariff (with per se reasonable percentages of FAC as alternatives), is not now subject to challenge in this proceeding. Unlike the privately negotiated contract rate at issue in *Milesburg*, the Pioneer Rate incorporated in PP & L's contract with REF–FUEL previously was evaluated for its justness and reasonableness in a formal commission rate proceeding providing full due process protections. The due process rights of

*burg* decision is inapplicable. The *Milesburg* decision would not be controlling here in any event. The precise holding of that case was:

> In our view, due process requires that, before the PUC may issue a declaration approving the legality of the terms and conditions of a contract for a utility's purchase of power from a QF *that includes payments for capacity,* the utility's customers must be provided with notice of the proceedings and an opportunity to be heard to challenge the proposed action.

*Milesburg,* 119 Pa. Commonwealth Ct. at 104, 546 A.2d at 1306 (emphasis added). The agreement involved in this case does not include payments for capacity.

customers that had been ignored by the PUC in *Milesburg* were accommodated long ago with respect to this case when the commission formally considered and approved the Pioneer Rate.[7]

A further distinction flows from that just described. In *Milesburg,* the legal conclusion that the contract rate was just and reasonable rested on the purely *factual* determination by the commission of the value of FAC. Because the determinative question was factual, customers had to be provided some kind of hearing in order to satisfy their due process rights. In the present case, because LVPC is not challenging any factual determination by the commission but rather the propriety of allowing the utility to recover levelized payments before those payments equal or exceed actual avoided cost, the question involved here is a purely *legal* question, as the PUC and the intervenors correctly perceive. This court recently reaffirmed the fundamental proposition of law that a hearing or trial procedure is necessary only to resolve disputed questions of fact and is not required to decide questions of law, policy or discretion. *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa.Commonwealth Ct. 259, 563 A.2d 548 (1989) (citing K.C. Davis, Administrative Law Treatise, Vol. 2 § 12:2 (1979) and Vol. 3 §§ 14:1–14:3 (1980)). *See also White Oak Borough Authority v. Pennsylvania*

7. This is not to say that commission-approved rates are inviolate. They are not, and the PUC has not claimed otherwise. In its order in this case the commission explained to LVPC the proper procedure for challenging such a rate. A customer claiming that an approved rate is excessive may file a complaint with the commission pursuant to section 701 of the Public Utility Code, 66 Pa.C.S. § 701, seeking a prospective change in the rate pursuant to section 1309, 66 Pa.C.S. § 1309. The commission will review the complaint and, in its discretion, may order a hearing upon it. Section 703, 66 Pa.C.S. § 703. Should the commission order such a hearing, the burden would rest squarely on the complaining party to prove that the previously-approved rate was excessive. *See Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa.Commonwealth Ct. 259, 563 A.2d 548 (1989). Such a procedure obviously is contrary to LVPC's efforts in this case to force a hearing in which the utility would bear the burden of proving that its recovery from ratepayers of the full amount of its payments under its contract with the QF is "just and reasonable."

*Public Utility Commission,* 175 Pa.Superior Ct. 114, 103 A.2d 502 (1954). The commission did not deprive LVPC of due process of law by failing to provide LVPC with the opportunity to present evidence at a hearing where the matter in dispute was a purely legal question.

The decision we reach today is entirely in accord with our recent decision in what may be viewed as a companion case involving the same parties, at No. 1002 C.D. 1988. There PP & L had made an ECR filing that included a claim for recovery of amounts paid to QFs. LVPC filed a complaint against the ECR, raising the same issue of the propriety of current utility recovery of payments to QFs that exceeded the utility's current actual avoided cost. Administrative Law Judge Joseph Klovekorn issued a recommended decision concluding that LVPC's complaint should be dismissed on the grounds of collateral estoppel, because the commission previously had considered and rejected the same argument advanced by LVPC in the case of *Joint Petition of Pennsylvania Power & Light Company and Specified Potential Cogeneration and Small Power Production Facilities for a Declaratory Order,* 61 Pa.P.U.C. 577 (1986). The commission adopted the recommended decision as its own action, and LVPC appealed.

This court affirmed the PUC's decision, concluding that the issue of the timing of recovery from ratepayers of amounts paid by PP & L to a QF was a legal question, that the commission correctly applied the doctrine of collateral estoppel in view of the commission's earlier ruling, and that, under those circumstances, the commission acted well within its discretion under section 703(b) of the Public Utility Code, 66 Pa.C.S. § 703(b), in dismissing LVPC's complaint without holding a hearing and did not violate LVPC's rights to due process of law.

The basic problem identified in LVPC's sequence of proceedings before the commission is not an illusory one. As LVPC noted in its petition to intervene and answer to PP & L's petition in this case, FERC recently has expressed concern that rate levelization may cause an "inter-genera-

tional equity problem" if ratepayers in the early years of utility-QF contracts are not the same as those in later years, especially where contracts are more front loaded, populations are more transient and contracts are of longer term. *Notice of Proposed Rulemaking,* Docket No. RM88–6–000 at 57, 1988 F.E.R.C. (CCH) ¶ 32,457 at 32,171 (March 16, 1988); 53 Fed.Reg. 9331 (March 22, 1988). Nevertheless, under the current state of both federal and state regulations and precedent, LVPC's attempt in this case to force PP & L to prove at a hearing the justness and reasonableness of PP & L's recovery of levelized payments to a QF pursuant to a contract incorporating a rate previously approved by the commission must fail.[8]

*Substantial Evidence*

LVPC also contends that the commission's order is not supported by the evidence of record. This claim is simply an extension of its due process argument, rather than a truly separate issue. Because the commission did not grant LVPC the hearing that it sought, LVPC asserts that the order is based only on pleadings and not on evidence. As the analysis above demonstrates, however, LVPC's claim in this proceeding raised only a legal issue that did not require a hearing for its resolution. The factual basis for the commission's action comes from the order initially approving the Pioneer Rate as being just and reasonable:

8. Further support for our conclusion here comes from an action taken by FERC after LVPC's appeal to this court. REF–FUEL had tendered to FERC for filing the same rate schedule that is the subject of the present case, as contained in the purchase power agreement between REF–FUEL and PP & L. REF–FUEL noted in its tender to FERC that the agreement was contingent on approval by the PUC of rate recovery of amounts paid by PP & L to REF–FUEL under the agreement. FERC evaluated and expressly accepted the rates for filing, while expressing its opinion that its action "would not require the state commission to approve them if a state court remand were to occur." *American REF–FUEL Company of Lehigh Valley,* Docket No. ER88–581–000, slip op. at 10 n. 24, 47 F.E.R.C. (CCH) ¶ 61,208 at —— n. 24 (May 12, 1989). Assuming that FERC is correct in viewing its acceptance of the rates as not having preemptive effect (presumably because of the conditional nature of the tender), we regard FERC's express approval of this levelized contract rate, in the light of the agency's recently expressed concerns, to be persuasive in favor of the propriety of PP & L's current recovery of payments under this contract.

Whenever the commission shall make any rule, regulation, finding, determination or order, the same shall be conclusive upon all parties affected thereby, unless set aside, annulled or modified on judicial review.

Section 316 of the Public Utility Code, 66 Pa.C.S. § 316.

Accordingly, the order of the Pennsylvania Public Utility Commission approving full current recovery by PP & L from ratepayers of amounts it pays to REF–FUEL under their contract is affirmed.

SMITH, J., dissents.

### ORDER

NOW, August 7, 1989, the order of the Pennsylvania Public Utility Commission at Docket No. P–880294, entered June 9, 1988, is affirmed.