628 A.2d 1187

**GPU INDUSTRIAL INTERVENORS, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 31, 1993.

Decided July 8, 1993.

628

James P. Dougherty, for petitioner.

Kathryn G. Sophy, Asst. Counsel, for respondent.

Daniel P. Delaney, for intervenor, Scranton Energy Partners.

Christopher P. Cullen, for amicus curiae, Borough of Throop.

Before CRAIG, President Judge, and DOYLE, PALLADINO, McGINLEY, SMITH and FRIEDMAN, Judges.

McGINLEY, Judge.

This case involves the relationship between two separate proceedings before the Pennsylvania Public Utility Commission (PUC or Commission). In the earlier proceeding, Metropolitan Edison Company (Met Ed or the utility) filed a petition in 1989 seeking Commission approval to establish a "Competitive Procurement Program" (bidding program) relating to a 200–Megawatt (MW) block of electric generating capacity (the bidding program proceeding). Under the proposal Met Ed would fulfill its obligation under Section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 824a–3, to purchase power from "qualifying facilities" (QFs) by means of competitive bidding among them.[1] Such a competitive procedure has advantages over negotiating separately with each QF or waiting for an order from the PUC to purchase. On January 5, 1990, the Commission authorized Met Ed to initiate a bidding program and referred the matter to the Office of Administrative Law Judge for hearing and analysis of Met Ed's capacity needs and of the specific design of the bidding program.[2]

Met Ed submitted its proposal for the design of the program, which included "Ceiling Prices" that were developed unilaterally as the maximum acceptable rates for bids. Al-

1. Pursuant to Section 210(a) of PURPA, a utility in need of energy or capacity must offer to purchase from a cogenerator or small power producer that is a QF. Pursuant to Section 210(b) of PURPA and 18 C.F.R. § 292.304(b)(2) and (6) of the regulations of the Federal Energy Regulatory Commission (FERC) implementing PURPA, the QF may demand a price that is equal to, but not greater than, the utility's full "avoided cost" (FAC or full avoided cost). Avoided cost is defined as the incremental cost to the utility of electric energy or capacity or both that, but for the purchase from the QF, the utility would generate itself or purchase from another source.

2. Because the procedure of evaluating each proposed utility-QF power purchase according to the FAC standard had proved difficult to implement, FERC issued a Notice of Proposed Rulemaking in 1988 proposing new regulations authorizing bidding procedures. However, FERC never formally adopted those regulations. Some states have implemented bidding procedures on their own. *See* S. Ferry, Law of Independent Power (Clark Boardman 1990), Chapter 9. The opinion and order of January 5, 1990, acknowledged that this proceeding was the Commission's initial approval of a bidding procedure.

though hearings before an Administrative Law Judge (ALJ) had been initiated in that proceeding, they were suspended as negotiations approached settlement. The ALJ issued a recommended decision urging the Commission to accept the "Joint Petition for Settlement" submitted by most of the parties, which included "Section IV, Terms and Conditions of Settlement" (Bidding Program Settlement). A listing of the Ceiling Prices was incorporated as an exhibit to the Joint Petition for Settlement. By order of December 12, 1991, the PUC approved the Joint Petition for Settlement, with slight modifications, subject to a period of twenty days for parties other than the Joint Petitioners to file exceptions. GPU Industrial Intervenors (GPUII), an ad hoc organization of large industrial customers of Met Ed,[3] had been granted intervenor status but was not a signatory to the Joint Petition for Settlement. When neither GPUII nor any other party filed objections, the PUC closed the docket in the bidding program proceeding.

In the later proceeding, from which the present petition for review arises, Pyropower Development Corporation (Pyropower) and Community Central Energy Corporation (Community Central) filed a petition in April of 1991 requesting a declaration that the order in the bidding program proceeding did not prohibit Met Ed from entering into a contract for purchase of power from Pyropower's proposed Scranton Energy Project (Scranton Project) and an order directing Met Ed to negotiate and execute such a contract (the Scranton Project proceeding). The Scranton Project was described as a 100–Megawatt (MW), anthracite-culm-fired cogeneration plant, which is to be a QF for purposes of Section 210 of PURPA.[4] Pyropower's petition alleged that Met Ed would have need for electric

---

3. GPUII is comprised of Alcoa–Lebanon Works, Allentown Cement Company, Carpenter Technology Corporation, Dana Corporation–Parish Division, Stone Container Corporation–York Mill and Yuasa–Exide, Inc.

4. A cogeneration facility is defined as a facility that produces both electric energy and steam or other forms of useful energy, such as heat, that are used for industrial or commercial heating or cooling purposes. Section 201 of PURPA, 16 U.S.C. § 796(18)(A). The Scranton Project proposal was later modified to 125 MW.

generating capacity around the time of the expected completion of the Scranton Project. Although Scranton is not in Met Ed's service territory, the utility located there agreed to wheel the purchased power to Met Ed. Community Central owns and operates the Scranton District Heating System (Scranton Heating System), a PUC-regulated supplier of steam heat in Scranton, whose remaining customers are primarily commercial and governmental entities. The petition also asserted that constructing the Scranton Project would have the ancillary effect of salvaging the Scranton Heating System, which allegedly is in danger of imminent failure due to technical inefficiencies and severe financial problems. Included in the Scranton Project is a proposal to rebuild the steam distribution system.

Met Ed opposed Pyropower's petition for the same reason that it refused to negotiate with Pyropower—Met Ed maintained that Pyropower must submit its proposal as a bid under the prospective bidding program. By opinion and order of August 15, 1991, the PUC concluded that the Scranton Project is "overwhelmingly in the public interest" both because of its own inherent value and because of the benefits relating to the Scranton Heating System. The PUC declared that a separate agreement with Pyropower was not barred. It directed Met Ed to negotiate an agreement with purchase rates at or below FAC as calculated according to a formula provided for this purpose in 52 Pa.Code § 57.34(c) and to submit the agreement for approval within sixty days. The Commission stated that, after an agreement was submitted, ratepayers would have an opportunity to be heard regarding a comparison of the contract rates to Met Ed's avoided costs, and that the order did not constitute rate recovery approval of amounts that Met Ed will be paying to Pyropower for capacity and energy.

Met Ed and Scranton Energy Partners (SEP), the successor in interest to Pyropower, negotiated an agreement (Scranton Project Agreement or contract), and Met Ed petitioned the Commission in October of 1991 to approve its terms and to approve full and current recovery from ratepayers for Met Ed's payments under it. The rates for the purchase of power,

including both energy and capacity components, were set at 99.86% of the Ceiling Prices from the bidding program proceeding. Met Ed's calculation of the net present value of payments to be made to SEP under the contract totalled approximately $1.485 billion. Comparing contract payments to payments of the full Ceiling Prices, Met Ed calculated an ultimate savings to ratepayers of $700,000, to be realized in the last year of the twenty-year contract.

Met Ed provided bill-insert notice to its ratepayers of the filing of the petition. GPUII filed an answer in opposition, asserting (1) that the proposed recovery of costs on an energy-only basis through the Energy Cost Rate mechanism was improper;[5] (2) that the contract prices of 99.86% of Ceiling Prices were too high because the price would be lower if the Scranton Project were subjected to bidding; (3) that front-end-loaded payments under the contract were improper; and (4) that the use of a "suspense account" rather than a "tracking account" to provide security for Met Ed against failure by SEP to deliver power was incorrect. GPUII requested a full evidentiary hearing on the petition. Other groups and individuals filed formal and informal objections as well.

In an opinion and order of May 26, 1992, the Commission approved the Scranton Project Agreement and Met Ed's full and current recovery of costs under it. Concerning the propriety of the contract prices, the PUC stated that it had examined the Ceiling Prices in the separate bidding program proceeding and, by approving the bidding program, had "acknowledged" that those prices were at or below avoided costs. The payments under the Scranton Project Agreement at slightly less than the Ceiling Prices were therefore less than avoided costs and were just and reasonable. The Commission concluded that all other objections raised were legal questions

5. GPUII's position that utility-QF contract costs that include both energy and capacity components should not be recovered on a straight energy basis was later determined by this court to be correct in an unrelated proceeding, *Allegheny Ludlum Corp. v. Pennsylvania Public Utility Commission,* 149 Pa. Commonwealth Ct. 106, 612 A.2d 604 (1992).

that had been addressed in the past and denied GPUII's request for a hearing.

GPUII petitions this court for review of the Commission's order of May 26, 1992. The questions it presents are: (1) whether the PUC erred by failing meaningfully to test the Scranton Project Agreement price against Met Ed's actual avoided costs; (2) whether the PUC violated substantive and procedural due process rights of GPUII and other ratepayers by refusing to permit an evidentiary review of the contract purchase price and the avoided cost; and (3) whether the PUC's determination that the Scranton Project is "overwhelmingly in the public interest" some two months before the contract between Met Ed and SEP was executed was arbitrary and capricious. SEP filed a motion with this court to quash GPUII's petition for review; we reserved disposition of that motion until after arguments on the merits. Both SEP and the PUC raise in their briefs questions of (1) whether GPUII failed to raise before the Commission (and so to preserve for appellate review) a claim that Scranton Project Agreement prices are greater than Met Ed's full avoided costs and (2) whether any such claim is barred by the doctrine of collateral estoppel in view of the PUC's order in the bidding program proceeding and the failure of GPUII to file exceptions or to appeal from that order.[6]

The basic principles relating to most of the issues in this case are described in *Barasch v. Pennsylvania Public Utility Commission*, 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296, *clarification granted*, 119 Pa.Commonwealth Ct. 81, 550 A.2d 257 (1988), *petition for allowance of appeal denied*, 523 Pa. 652, 567 A.2d 655 (1989) (*Milesburg I* ). In that case a utility and a QF privately negotiated an agreement for a purchase of power over a period of thirty years, including payments for capacity. They conditioned their agreement on the promul-

6. The scope of our review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law committed and whether the necessary findings of fact are supported by substantial evidence in the record. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 561, 493 A.2d 653 (1985).

gation of a rule by the PUC or the existence of an order, final beyond appeal, approving the legality of the agreement and the full and current recovery of the utility's costs under it. The utility petitioned the Commission for a declaratory order to be published in the Pennsylvania Bulletin stating that the agreement was approved subject to the filing of exceptions within thirty days; that the utility would be authorized to pass the charges through to ratepayers through the Energy Cost Rate (ECR) mechanism established in Section 1307 of the Public Utility Code (Code), 66 Pa.C.S. § 1307; and that the capacity involved would not result in any excess capacity determination.

The utility served notice of its petition on the active parties to its most recent base rate case. Two large industrial customers jointly petitioned to intervene and sought dismissal of the utility's petition or that a hearing be held. Based on a calculation of the utility's avoided cost by PUC staff, which was not of record in the proceeding, the Commission concluded that the agreement rate was below the actual avoided costs, and so was per se reasonable. The PUC did not conduct a hearing on the petition, and it did not publish its order approving it for exceptions, as the utility had requested.

On appeal, this court reviewed Pennsylvania Supreme Court precedent relating to procedural due process rights in the context of administrative action. We took note of the Supreme Court's fundamental principle that where administrative action is adjudicatory in nature and affects substantial property rights the agency must comply with the basic due process requirements of notice to those affected and an opportunity to be heard to challenge the action in some meaningful manner. The Commission's approval of the utility-QF contract was adjudicatory in nature and involved substantial property interests of ratepayers because of the payments for capacity in addition to energy (which are analogous to a utility's payments to construct its own capacity). Because there was no compelling reason for delaying the opportunity to be heard until after the agency action we concluded that it

must precede the PUC's approval.[7] Given the federal and state policy of encouraging cogeneration and small power production we stated that the Commission should devise a procedure providing the essential elements of a hearing but allowing consideration of such petitions in as expeditious and minimally burdensome a manner as possible. We directed the PUC to make its own calculation of the maximum allowable capacity cost credit part of the record of any such proceeding and to provide access to parties to its calculations before the hearing. Finally, in view of the magnitude of the costs associated with the contract—allegedly a rate increase of $10 million per year—we directed notice for the proceeding on remand be provided according to the very thorough requirements of 52 Pa.Code § 53.45(a) (individual notice by mail, hand delivery or bill insert for general rate increase over $1 million).

Under PURPA and *Milesburg I* the crucial element of the PUC's consideration of a utility's request for approval of privately negotiated rates in a contract with a QF that includes capacity payments is the purely factual determination of the value of FAC.[8] Without making such a determination of record, the PUC cannot fulfill its duty under PURPA and the federal and state regulations implementing it to determine

**7.** *Compare Allegheny Ludlum Steel Corp. v. Pennsylvania Public Utility Commission,* 501 Pa. 71, 459 A.2d 1218 (1983). There the Supreme Court upheld the ECR mechanism's automatic pass-through to ratepayers of utilities' unanticipated fuel cost increases, subject to a year-end proceeding with full participation by all interested parties to determine if collections under the ECR had been excessive and, if so, providing for refunds with interest. The Court concluded that the pressing need to maintain the financial integrity of utilities and hence their ability to provide efficient, dependable service justified providing the hearing after the rate increase collections.

**8.** FAC varies over time. In *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission,* 135 Pa. Commonwealth Ct. 15, 579 A.2d 1337 (1990), *petitions for allowance of appeal granted,* 529 Pa. 623, 624, 629, 600 A.2d 539, 542, 543 (1991) (*Milesburg II* ), we held that FERC regulations require that the critical moment in time for the Commission to consider when making its required calculation of FAC is the time when the QF incurs a legally enforceable obligation to deliver power. If the utility refuses to negotiate in good faith, the critical moment in time is when the QF has done everything in its power to incur such an obligation.

that contract costs are at or below FAC. In the present case, the PUC was required to make such a determination on the record after adequate notice, unless, as the Commission and SEP contend, that factual determination already had been made in another proceeding in a manner, for example, that resulted in estoppel or its legal equivalent.

We reject the assertions of SEP and the Commission that GPUII failed to preserve the question of whether the Scranton Project Agreement prices are equal to or below FAC. In its answer in opposition to Met Ed's petition GPUII did not frame the issue in precisely those terms. It did assert that the prices would be lower if the Scranton Project were subjected to the bidding process, that the contract is "unfortunate, untenable and economically disastrous" and that a "full evidentiary hearing to test all assumptions and justifications in [the pricing provisions] is critically needed." Answer of GPUII to Petition of Met Ed ¶¶ 9, 10; Reproduced Record (R.R.) 282a, 283a. Under PURPA and the FERC regulations, as explained in *Milesburg I*, the PUC has an absolute duty to determine whether the rates of a utility-QF contract submitted for its approval are at or below FAC. Ordinarily, the PUC can fulfill that duty only by making a calculation of FAC on the record and comparing that value to the contract rates. GPUII requested a hearing and the PUC denied the request. The issue here is not the artfulness of GPUII's pleading but whether the PUC has some legally sufficient reason for declining to hold a requested hearing that it is otherwise required to conduct under PURPA. Accordingly, we shall dismiss SEP's motion to quash GPUII's petition for review.

The PUC and SEP contend that GPUII is collaterally estopped from raising any challenge to the conclusion that Ceiling Prices are at or below FAC. They note that GPUII was an intervenor in the bidding program proceeding and failed to file exceptions to the Commission's order approving the Joint Petition for Settlement. The PUC and SEP cite *Safeguard Mutual Insurance Co. v. Williams*, 463 Pa. 567, 345 A.2d 664 (1975), for the test for applying collateral estoppel: (1) the issue decided in the previous action is identical;

(2) there was a final judgment on the merits; (3) the party attempting to raise the issue participated in the previous litigation; and (4) that party had a full and fair opportunity to litigate the issue previously.

The *Safeguard* formula is an incomplete statement of the law of collateral estoppel or issue preclusion. Recently, our Supreme Court concisely stated the requirements for proper application of the doctrine of collateral estoppel:

> [T]he objecting party must show that *'the fact or facts at issue in both instances were identical;* [and] that these facts were essential to the first judgment *and were actually litigated in the first cause.'* *Schubach v. Silver,* 461 Pa. 366, 377, 336 A.2d 328, 334 (1975). We have also required that the party against whom a plea of collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in a prior action. *In re Ellis' Estate,* 460 Pa. 281, 287, 333 A.2d 728, 731 (1975).

*Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick,* 526 Pa. 541, 546, 587 A.2d 1346, 1348, *cert. denied,* —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991) (emphasis added). *See also City of Pittsburgh v. Zoning Board of Adjustment of City of Pittsburgh,* 522 Pa. 44, 559 A.2d 896 (1989) (issue preclusion forecloses relitigation in a later action of an issue of law or fact that was actually litigated and necessary to the original judgment, citing *Clark v. Troutman,* 509 Pa. 336, 340, 502 A.2d 137, 139 (1985)); *J & L Steel Corp. v. Workmen's Compensation Appeal Board (Jones),* 145 Pa.Commonwealth Ct. 201, 602 A.2d 912 (1992).

In *Schubach v. Silver* (filed several months before *Safeguard* in 1975) the Supreme Court reiterated that the essence of the law of collateral estoppel is "merely a judicial translation of the Restatement, Judgments, § 68, which is the accepted law in Pennsylvania." *Schubach,* 461 Pa. at 377, 336 A.2d at 333. Section 68 has been superseded by the Restatement (Second) of Judgments § 27 (1980), which states, in language very similar to the former section: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment,

the determination is conclusive on a subsequent action between the same parties, whether on the same or a different claim." *See generally* Fleming James, Jr., Geoffrey C. Hazard, Jr. and John Leubsdorf, Civil Procedure §§ 11.17–11.22 (4th ed. 1992).

The position of the Restatement (Second) of Judgments concerning actual litigation of issues is as follows:

> *e. Issues not actually litigated.* A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action....
>
> ....
>
> In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention.

Restatement (Second) of Judgments § 27 cmt. e (1980).

As the Restatement commentary explains, the policy of granting preclusive effect in later actions on different claims only to matters that were actually litigated previously stems from the recognition that there are many reasons why a party may choose not to raise an issue or to contest an allegation in a particular action, e.g., relative economic unimportance. If preclusive effect is given to matters not litigated, then the omitted points cannot be raised in any future dispute between the parties, no matter how unforeseeable the context. This result discourages compromise or the narrowing of issues by stipulation and serves to intensify litigation. *Id. See also* Civil Procedure § 11.18. For example, in the bidding program proceeding it is unknown whether GPUII and other objectors were concerned whether the Ceiling Prices matched perfectly with those under full avoided costs, because the entire purpose of the proceeding was to implement a system of

competition among QFs, with the expected result of significantly lower actual bids.

 The opposite rationale operates, of course, in circumstances where the requirements for the application of the doctrine of res judicata or claim preclusion are met. In a later action following a final judgment those requirements are: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of the quality or capacity in the persons for or against whom the claim is made. *City of Pittsburgh*. In such a situation the plaintiff's original claim merged into the original judgment. To protect the finality of judicial (or administrative) decisions, the parties can and must be prevented from relitigating the same claim and from raising any matters that might have been but were not raised in the first action. Claim preclusion has no application to the present case. Met Ed's claim in this petition proceeding is that its contract relating to the Scranton Project is proper under PURPA and applicable regulations and that it is entitled to recover associated costs from ratepayers. This is entirely separate and distinct from its claim in the earlier proceeding that it should be permitted to implement the bidding program described in the Joint Petition for Settlement. Indeed, the sole point finally determined by the order of August 15, 1991, was that the Scranton Project petition was exempt from any bidding program for Met Ed that might be established.

The PUC's application of the doctrine of collateral estoppel in the present case violates the established requirements. First, the Ceiling Prices from the bidding program proceeding are in no sense "identical" to prices determined by a calculation of full avoided costs in an unrelated utility-QF contract petition proceeding. The Ceiling Prices in the bidding program proceeding apply to the 100 MW block of capacity that remained after the PUC's order of August 15, 1991, permitted Met Ed to remove 100 MW from the 200 MW the PUC initially approved as appropriate for the experimental bidding program. The 100 MW block of capacity (later increased to

125 MW) involved in this petition proceeding is different and distinct.

More importantly, the Ceiling Prices are different in nature from, and not necessarily equal to, prices under a calculation of full avoided cost for a utility-QF contract that is outside the bidding program. The purpose of the bidding program proceeding was to establish a setting where QFs would bid against each other for the opportunity to provide a specified block of capacity. The expectation of everyone involved was that competition among QFs under such a program would drive offers lower than the utility's full avoided costs, which the QFs could otherwise demand under PURPA. Nowhere in the Joint Petition for Settlement approved by the PUC or in the PUC's order itself were the Ceiling Prices (which were unilaterally established by Met Ed in the bidding program proceeding) expressly stated to correspond to prices under a calculation of Met Ed's full avoided costs for the capacity at issue there, much less for capacity in unrelated proceedings.

Indeed, they are inapplicable to unrelated proceedings. FERC regulations implementing PURPA require that, where the utility so elects, full avoided costs must be calculated according to factors in existence at the time the QF incurs a legally enforceable obligation to deliver power. 18 C.F.R. § 292.304(d); *Milesburg II*. Even if ceiling prices may be set to cover QF proposals for a specified period under a bidding program such prices have no value for calculating FAC at the time of a petition proceeding unrelated to the bidding program. Ceiling prices under a bidding program and full avoided costs in an unrelated petition proceeding are distinct. They are not "identical," even though they might have similar or possibly the same values in a particular instance.

Most importantly, there has never been a factual finding that the Ceiling Prices actually reflected full avoided costs in the bidding program proceeding. The full avoided costs were never "determined" or recognized in the PUC's order. Although hearings had been initiated in that proceeding they were suspended as negotiations approached settlement. The ALJ issued a recommended decision urging the PUC to accept

the resulting Joint Petition for Settlement, which included the Bidding Program Settlement proposed by most of the parties (not including GPUII). The PUC's order of December 12, 1991, adopted that recommendation. The PUC's order did no more than approve the Bidding Program Settlement and permit implementation of the bidding program. This order by the PUC is analogous to the entry by a court of a consent judgment or a consent decree following settlement of an action by the parties.

■ Pennsylvania law clearly is consistent with the Restatement (Second) position that entry of a consent judgment does not constitute a "determination" by the court of the matters in controversy. In *Commonwealth v. United States Steel Corp.*, 15 Pa.Commonwealth 184, 190–91, 325 A.2d 324, 328 (1974) (en banc), involving an appeal from a court's order in a proceeding to enforce a consent decree entered pursuant to an agreement among the owner of a coke by-product plant, the Commonwealth and a county, the court stated:

> [T]he order of the court upon which the subject petition was based was a consent decree. The effect of such a decree was clearly stated in *Commonwealth v. Rozman*, 10 Pa.Commonwealth Ct. 133, [137,] 309 A.2d 197, [199] (1973): 'A consent decree is not a legal determination of the matters in controversy but is merely an agreement between the parties. It is in essence a contract binding the parties thereto. *Universal Builders Supply, Inc. v. Shaler Highlands Corporation*, 405 Pa. 259, 175 A.2d 58 (1961).'

■ In addition, the Bidding Program Settlement approved by the PUC includes the following provision:

> 2. The Settlement reflects significant compromises between the Petitioners and (a) is proposed solely for the purpose of settling the present proceeding (b) is made without any admission by any party hereto as to any matter of fact or law and (c) is without prejudice to any position advanced by any Petitioner on the record in this proceeding or that might be adopted by any Petitioner during subsequent litigation. Notwithstanding the foregoing, if the set-

tlement is approved and implemented as contemplated herein, the Petitioners shall not in any subsequent proceeding take any action or advocate any position which would disrupt the Settlement.

Joint Petition for Settlement, Section IV, ¶ 2; Reproduced Record (R.R.) 420a. This language expresses the firm intent of the signers of the Joint Petition for Settlement *not* to be contractually bound in unrelated litigation "as to any matter of fact or law" and *not* to have the Bidding Program Settlement be given any effect in any other litigation. Hence the exception recognized by the Restatement does not apply. To give preclusive effect to any factual matters from the Bidding Program Settlement renders this provision meaningless.[9] In addition, this limiting language may well have influenced the decision of GPUII and others not to file exceptions. It is obvious that the signers of the Joint Petition for Settlement cannot fairly expect any preclusion to apply in the Scranton Project proceeding to GPUII, which was not a signatory, in view of Paragraph 2.

Further, the values of the Ceiling Prices in the bidding program proceeding were not supported by any evidence of a calculation of full avoided costs in that record. Paragraph 10 of the Bidding Program Settlement states that components of the Ceiling Price against which proposals will be evaluated by Met Ed are set forth in Exhibit C, and the various components of the Ceiling Price for the years in that exhibit shall be the benchmark for the price evaluation under the bidding program. R.R. 423a. However, Exhibit C, R.R. 438a, is a table headed "Ceiling Price Summary," which lists Ceiling Prices but does not include any calculation showing how those prices were determined. Paragraph 11 states that the Petitioners understand and acknowledge that by agreeing to the Exhibit C Ceiling Prices they are specifically *not* agreeing on or endorsing the methodology used to establish those prices,

9. The fact that the Bidding Program Settlement was limited in this manner further illustrates its status as a contract rather than a judgment. Parties, and indeed courts and agencies themselves, lack the power to limit the future application and collateral effect of validly entered final judgments.

the assumptions contained therein or the proper allocation of the various cost components of those prices.

The PUC admits that no evidence on the factual issue of the calculation of value of full avoided costs was introduced in the bidding program proceeding because it was settled. The PUC states that "this was a *settlement,* so no data had to be presented." Brief of Respondent PUC at 25. This statement pointedly illustrates the reason for the policy of not giving preclusive effect to matters involved in settlements. The value of full avoided costs is a purely factual determination that can only be derived from relevant data. The PUC is arguing that the crucial fact was "determined" without data *because* the proceeding was settled.

The PUC also argues that GPUII had the opportunity to present any data it wished. It states that "presumably" each party in the bidding program proceeding made its own calculation of full avoided costs and that a calculation based on information and projections supplied by Met Ed and on file with the PUC "would demonstrate" that Ceiling Prices are actually below full avoided costs. The PUC avers that its staff performed such calculations, which are not part of the record here but are relevant to the bidding program proceeding, and, if requested, the PUC will supply such calculations and data to the court and other parties. Brief of Respondent PUC at 26–27. These assertions graphically demonstrate that there is nothing *in the record of that proceeding* on which to base a determination of full avoided costs.

The PUC's assertions are essentially identical to those it made in *Milesburg I*—that it *privately* performed a calculation of FAC, and, according to that private calculation, the contract rate is lower and therefore per se just and reasonable. We rejected that position then and we reject it now. Our legislature in the Public Utility Code granted the PUC broad discretion to determine what rates are just and reasonable. Congress in PURPA granted the Commission further powers to approve and to compel utility purchases from QFs so as to to encourage cogeneration and small power production. The meaning of the constitutional due process rights of ratepayers

as to adjudications affecting their substantial property interests is that the legislature and Congress did not and could not grant to the Commission the power to make such determinations in private.

The present petition proceeding involves the effective purchase by ratepayers of 125 MW of capacity and net present value of total payments, according to Met Ed's estimates, of approximately $1.485 *billion* over a period of twenty years. Met Ed's ratepayers received bill-insert notice of the filing of the petition. But the PUC's erroneous conclusion that the factual determination of the value of full avoided costs already had been conclusively established in the bidding program proceeding (and its conclusion that all other issues were purely legal) led the PUC to decide not to conduct any evidentiary hearing in this proceeding. Consequently, ratepayers received no notice of any hearing or of further developments in the case and they were provided no opportunity to be heard.

SEP asserts that this court has held that a hearing is not necessary every time a utility petitions the PUC for approval of a contract with a QF and of rate recovery of associated costs, citing *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission*, 128 Pa.Commonwealth Ct. 259, 563 A.2d 548 (1989), and *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission*, 128 Pa.Commonwealth Ct. 276, 563 A.2d 557 (1989). The first of those cases did not involve a petition by a utility for rate recovery of QF costs at all. Rather, that case commenced with a complaint filed pursuant to Section 701 of the Code, 66 Pa.C.S. § 701, which permits any person with an interest in the subject matter to complain in writing concerning anything done or omitted to be done by any public utility in claimed violation of law or order of the PUC. The complaint challenged the legality of levelized payments to QFs in the utility's revised ECR filing pursuant to the "Pioneer Rate" previously approved for certain types of QF purchases. An ALJ had dismissed the complaint without a hearing under his powers pursuant to Section 703(b) of the Code, 66 Pa.C.S. § 703(b),

concluding that where the validity of the Pioneer Rate had been litigated unsuccessfully by the same complainant in an earlier proceeding, in which the complainant lost and did not appeal, there was no need for an investigation or a hearing on the new complaint raising the same issues. This court affirmed, noting that the PUC did not err by declining to hold an evidentiary hearing where only legal issues were raised by the complaint.[10]

The second *Lehigh Valley Power Committee* case did involve a direct appeal from a petition for rate recovery of costs pursuant to a utility's contract for the purchase of energy only (not capacity), where the contract terms included rates pursuant to the Pioneer Rate, which the PUC had approved and incorporated in the utility's tariff as a standardized rate for purchases by the utility involved from certain types of QFs some seven years earlier in a formal rate proceeding.[11] We affirmed the PUC's order approving the utility's petition. We concluded that, although *Milesburg I* technically was not applicable because the contract did not involve a capacity purchase, the PUC's declining to hold an evidentiary hearing did not violate due process rights because (1) the complainant did not challenge the rate for purchases under the contract but only the propriety of the levelized payments and (2) the factual issue of the relation of the contract rate to full avoided cost had been determined with full notice to all concerned and opportunity to be heard in the original formal rate proceeding that approved the Pioneer Rate.

In contrast, the present proceeding *is not* a request for approval of contract prices under a *standardized rate*, previously established in the utility's tariff (and also previously

10. In the present case, GPUII's issues relating to the propriety of the recovery of costs on an energy-only basis, the front-end-loaded payments under a utility-QF contract and the use of a "suspense account" versus a "tracking account" for providing security did involve purely legal questions (as opposed to the purely factual determination of FAC), and the PUC correctly concluded that an evidentiary hearing was not necessary to resolve them.

11. The FERC regulations implementing PURPA permit and even require the adoption of standardized rates for purchases from certain types of QFs. *See* 18 C.F.R. § 292.304(c).

litigated). Rather, this proceeding *is* the original request for approval of *privately negotiated rates* under a utility-QF contract involving a substantial effective purchase of capacity and recovery of associated utility costs, with total payments near $1.5 billion. This proceeding is precisely analogous to that involved in *Milesburg I*. The only difference is that the total costs involved are much higher. The *Lehigh Valley Power Committee* cases are inapposite.

Additionally, assuming for the sake of argument that a value of full avoided costs was litigated and determined in the bidding program proceeding and assuming that value is entitled to preclusive effect in the Scranton Project proceeding, under the second *Lehigh Valley Power Committee* case the question arises as to the quality of the notice in the proceeding that produced the preclusive determination. The record here reveals that notice of the bidding program proceeding was provided only through publication in the Pennsylvania Bulletin. Under *Milesburg I* such notice for a purchase of capacity of the magnitude involved here is inadequate, which further compounds the error.

Finally, in the interest of fairness it is necessary to give GPUII a hearing in view of the PUC's earlier representations that appear in the record of this proceeding. The PUC's opinion and order of August 15, 1991, concluded that the Scranton Project was "in the public interest," but that conclusion was necessarily tentative. That order directed Met Ed to negotiate a contract with Pyropower to be submitted for PUC approval. Such a contract cannot be in the public interest unless its rate is legal under PURPA and applicable federal and state regulations.[12] The opinion expressly stated the contract should provide for rates "at or below Met Ed's

---

**12.** Recognition of the necessarily tentative nature of the public interest determination of August 15, 1991, disposes of both GPUII's contention that the determination was arbitrary and capricious and the PUC's response that GPUII should have appealed at that time. On this point the PUC's order was clearly interlocutory. The final, appealable determination that the Scranton Project is in the public interest did not occur until the PUC issued its order of May 26, 1992, approving the Scranton Project Agreement.

avoided costs as defined by 52 Pa.Code § 57.34(c)," and that once the contract was submitted, "Ratepayers will at that time have an opportunity to be heard regarding a comparison of the contract rates to Met Ed's avoided costs. Our order today does not constitute rate recovery approval of amounts that Met Ed will be paying to Pyropower for capacity and energy." PUC Opinion and Order of August 15, 1991, slip op. at 25–26; R.R. 144a–45a.

When the PUC issued its order of December 12, 1991, approving the Bidding Program Settlement and closing the docket in the bidding program proceeding, GPUII had in hand the August 1991 order stating that a hearing in the Scranton Project proceeding would be provided. Nothing in the bidding program proceeding order indicated that it would have any effect whatsoever on the separate and distinct Scranton Project proceeding. Despite this express assurance that proper procedures would be followed the PUC reversed itself by concluding that the factual determination of the value of full avoided costs already had been made. Regardless of whether GPUII is estopped from complaining about a rate in a future utility-QF contract under the bidding program, GPUII was entirely justified in relying on the PUC's express assurances in the Scranton Project proceeding.

Accordingly, we vacate the order of the Commission on May 26, 1992, and remand for the Commission to reconsider the propriety of the Scranton Project Agreement, after providing adequate notice to ratepayers and an opportunity for them to be heard on the terms of the contract relating to prices.[13]

## ORDER

AND NOW, this 8th day of July, 1993, the order of the Pennsylvania Public Utility Commission at Docket No. P–

---

13. The Borough of Throop, which did not participate in the proceedings before the Commission, filed a notice of participation as amicus curiae, in response to which the PUC filed a motion to strike, because the issues raised dealt with environmental concerns. We reserved disposition of that motion also pending review of the merits. Because the Borough of Throop's brief raises issues outside the jurisdiction of the PUC we grant the Commission's motion to strike.

910514, entered May 26, 1992, is vacated. We remand this matter to the Commission to reconsider its order that rates established in the power purchase agreement between Scranton Energy Partners and Metropolitan Edison Company are just and reasonable and that the utility's costs under that agreement may be fully collected from ratepayers. Before issuing a new order, the Commission shall provide the utility's ratepayers with notice and an opportunity to be heard on questions relating to prices under the agreement in a manner consistent with the foregoing opinion.

The motion of Scranton Energy Partners to quash the petition for review of GPU Industrial Intervenors is denied. The motion of the Commission to strike the brief of the Borough of Throop as amicus curiae is granted.

Jurisdiction is relinquished.

Pellegrini, J., concurs in the result only.