KES BROCKTON, INC., & another[1] *vs.* DEPARTMENT OF
PUBLIC UTILITIES.

Suffolk. May 17, 1993. - August 13, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Electric Company. Public Utilities*, Intervention. *Practice, Civil*, Parties,
Standing. *Due Process of Law*, Regulation of economic activity. *Ad-
ministrative Law*, Agency, Adjudicatory proceeding. *Words*, "Ag-
grieved party in interest."

Petitioners who proposed to enter into a contract to sell electricity to an
electric company had no standing as "aggrieved part[ies] in interest" to
appeal pursuant to G. L. c. 25, § 5, from the denial by the Department
of Public Utilities of their motion for leave to intervene in the depart-
ment's contract review process, where the petitioners had no statutory
right to intervene, and where their mere expectation of the financial
benefits that would result from a favorable decision by the department
did not amount to a property interest such as would give them a due
process right to have the department's proceeding conducted as an ad-
judicatory hearing with their intervention constitutionally mandated.
[162-168]

PETITION filed in the Supreme Judicial Court for the
county of Suffolk on December 14, 1992.

The case was reported by *Wilkins*, J.

The case was submitted on briefs.

*Marc A. Reardon, Jonathan M. Albano, Debra K. May-
field & Marcy Friedman* for the petitioners.

---

[1]Tamal Development Corporation (Tamal). KES, a subsidiary of
Kenetech Energy Systems, Inc., purchased a ninety-five per cent interest in
the project. Tamal retained the remaining five per cent interest. KES and
Tamal formed Brockton Wood, L.P., which succeeded to Tamal's rights
under the project proposal in 1991. Both petitioners are general partners of
Brockton Wood, L.P.

*Scott Harshbarger*, Attorney General, *& Robert J. Munnelly, Jr.*, Assistant Attorney General, for Department of Public Utilities.

ABRAMS, J. The petitioners, general partners of Brockton Wood, L.P. (Brockton Wood), appeal from the disapproval by the Department of Public Utilities (department) of an electricity purchase contract between Brockton Wood and the Western Massachusetts Electric Company (WME); the department's denial of the petitioners' motion to intervene in the department's contract review process; and the department's denial of the petitioners' motion for reconsideration. The petitioners appealed to the Supreme Judicial Court for Suffolk County; on joint motion of the parties, see G. L. c. 25, § 5 (1992 ed.), a single justice reserved and reported the case to this court. We conclude that the petitioners have no standing to appeal.

On October 5, 1988, WME issued a solicitation (RFP) for bids for the competitive purchase of electricity from Qualifying Facilities (QFs), pursuant to 220 Code Mass. Regs. § 8.00 (1986) (QF regulations). On February 2, 1989, Tamal Development Corporation (Tamal) submitted a project proposal in response to the RFP. During October and November, 1989, Tamal provided WME further details on the proposal. On December 12, 1989, WME notified Tamal that the Tamal proposal would be included in the award group. See 220 Code Mass. Regs. § 8.05 (6) (a) (1986).

As originally bid, the project proposal was as follows: The project would be located in Assonet, inside WME's service area; WME would purchase electricity the project generated from Tamal; the primary generating technology would be a low-BTU boiler/steam turbine generator; the primary fuel would be wood waste, supplied to Tamal by the owner of the project site, from on-site sources (under a letter of intent); the project capacity would be twenty megawatts (MW); the contract would run for twenty years from the expected in-service date of January 1, 1994; and the price had a fixed and variable component. Tamal Energy, Inc., was listed as the 100% owner of the project.

In January, 1990, Tamal proposed to WME that the project's generating technology be changed from wood gasification to a wood-fired stoker. WME initially rejected this change as constituting a change that would fundamentally alter the nature of the proposal. Following a department decision that WME interpreted as urging utilities to be more flexible in dealing with project developers, WME allowed Tamal to update its proposal to include the technology change, but suspended contract negotiations and recalculated the project's score to determine whether the revised project remained in the award group. WME reranked the proposal and notified Tamal on May 10, 1990, that the proposal remained in the award group, and that contract negotiations could be reopened.

On May 15, 1990, Tamal informed WME that the project would have to be relocated to an alternative site. WME suspended negotiations pending verification of the economic feasibility of the project after the proposed changes and reranking of the project. On July 18, 1990, WME notified Tamal that the rescored project[2] remained within the award group; contract negotiations resumed.

In October, 1990, WME rejected Tamal's subsequent request to modify its pricing formula and to increase project size. In November, 1990, Tamal informed WME that Tamal intended to proceed on the bid terms and would provide a revised bid proposal; WME provided Tamal a draft contract incorporating all agreed changes.

During the first part of 1991, the parties continued to revise the proposed contract. WME repeatedly requested a revised project proposal. On July 15, 1991, WME notified Tamal that if WME did not receive an updated proposal by August 1, 1991, the project would be removed from the award group. On July 31, 1991, and during the following three weeks, Tamal informed WME of various changes in the proposed project's ownership, capital structure, capital costs, schedule and project description. Tamal also indicated

[2]The project site was relocated to Brockton.

that the project no longer had a committed long-term fuel supply. WME again suspended contract negotiations to obtain information it needed to rescore and rerank the project in light of the proposed changes. On October 9, 1991, WME notified Brockton Wood[3] that the proposal remained in the award group and that contract negotiations could be resumed.

In October, 1991, Brockton Wood requested that WME accede to a reduction in project size from twenty MW to 16.9 MW. WME agreed to the change in project size. In February, 1992, KES informed WME that an alternate site had been chosen in Brockton to address environmental considerations. WME agreed to the change in site. Brockton Wood executed the electric power purchase agreement (contract) in June, 1992; WME executed the contract in July, 1992.

In September, 1992, WME submitted the contract to the department for review pursuant to 220 Code Mass. Regs. § 8.03 (2). In October and November, 1992, the department issued, and WME responded to, four information requests regarding the contract. On November 11, 1992, Brockton Wood submitted to the department comments on WME's response to a department information request regarding an avoided-costs calculation of the Brockton Wood project proposal. Brockton Wood also filed a petition to intervene pursuant to 220 Code Mass. Regs. § 1.03 to present additional evidence to the department disputing some of the assumptions that WME relied on in its cost-benefit analysis. Brockton Wood asked "to participate as an intervenor in this matter, and where appropriate, engage in any technical sessions or hearings, offer evidence and cross examine witnesses, present oral argument before the Department, and submit comments and briefs for the Department's consideration." WME corrected its original response and commented on Brockton Wood's earlier comments.

---

[3]The newly-formed Brockton Wood, L.P., succeeded to Tamal's rights under this proposal. See note 1, *supra.*

On November 16, 1992, the department issued a letter decision disapproving the contract pursuant to 220 Code Mass. Regs. § 8.03 (2), focusing on the number and significance of the changes made to the original project proposal.[4] The department denied Brockton Wood's motion to intervene that same day, thereby limiting Brockton Wood's participation to the submissions previously filed with the department.

On December 14, 1992, the petitioners filed a petition for appeal with the Supreme Judicial Court for Suffolk County under G. L. c. 25, § 5, and a motion for reconsideration with the department; both pleadings challenged the department's disapproval of the contract and the department's decision to deny intervention. On January 22, 1993, Brockton Wood moved for leave to file a memorandum in support of its motion for reconsideration in the department. On March 15, 1993, on joint motion of the parties, the single justice reserved and reported the case to this court. On May 19, 1993, the department denied Brockton Wood's mo-

---

[4]The department stated: "[T]here have been many material changes to the project originally proposed by Tamal. Our review of the contract has raised substantial concerns regarding the many changes to the originally proposed contract and the four years it has taken WMECo and Brockton Wood to execute a contract to fulfill the [d]epartment's directives as specified in RFP 1. We recognize that, before accepting any proposed project modification, the Company appropriately reevaluated the Brockton Wood project in light of other project proposals received in RFP 1. However, the [d]epartment regards such alterations in a project proposal, both in number and significance, to be detrimental to an electric company's resource procurement and planning process, as well as to its ability generally to make resource selections efficiently and effectively and to the benefit of its customers. . . . WMECo has rescored the RFP 1 project proposals after each change to the Brockton Wood contract, and Brockton Wood has remained ranked in the Award Group after each rescoring. However, based on the number and significance of the changes to the initially proposed project, we find that the contract submitted for review by the [d]epartment is not reasonably related to Brockton Wood's project proposal submitted to WMECo for ranking in RFP 1. Indeed, this contract embodies precisely the sort of 'radical transformations' (major changes in site and technology, etc.) in project proposals that the Department has indicated could warrant rejection of negotiated contracts. *IRM Rulemaking*, D.P.U. 89-239, p. 35 (1990). . . . Therefore, the [d]epartment disapproves this contract pursuant to 220 [Code Mass. Regs. ]§ 8.03 (2) (1986)."

tion for reconsideration, upholding its earlier decision denying Brockton Wood's intervention on the grounds that (i) 220 Code Mass. Regs. § 8.03 (2) did not require a full G. L. c. 30A adjudicatory hearing[5]; (ii) Brockton Wood had no constitutional right to a full adjudicatory hearing; and (iii) the department's review of the contract did not require process beyond what the department gave. The department also emphasized that Brockton Wood failed to meet the department's standards for obtaining reconsideration, and rejected Brockton Wood's assertion that the department made insufficient findings and that the department relied on inapplicable regulations in rendering its decision. The department refused to consider Brockton Wood's January 27, 1993, memorandum because Brockton Wood failed to show good cause for filing the memorandum after the twenty-day filing period required by 220 Code Mass. Regs. § 1.11 (10). On March 23, 1993, the petitioners moved this court to amend their petition for appeal to include an appeal of the department's denial of the motion for reconsideration.

The department contends that the petitioners are not "aggrieved part[ies] in interest" under G. L. c. 25, § 5, and therefore have no standing to appeal the disapproval of the contract.[6] We agree.

We determine standing to appeal in this case by G. L. c. 25, § 5, which expressly limits standing to an "aggrieved party in interest." *Newton* v. *Department of Pub. Utils.*, 339 Mass. 535, 543-544 & n.2 (1959) ("except as to the stan-

---

[5]Title 220 Code Mass. Regs. § 8.03 (2) (1986) provides, in pertinent part, "All agreements for or amendments to agreements for transactions between utilities and qualifying facilities other than an approved Standard Contract as defined in 220 [Code Mass. Regs. §] 8.03(1) must be filed with the Department and the Attorney General by the purchasing utility. No such agreement shall become effective until sixty (60) days after filing unless earlier approved by action of the Department. The Department may investigate the propriety of any such contract as the public interest requires. If the Department does not issue a decision within sixty (60) days of the filing date of an agreement, such agreement shall be deemed approved."

[6]The record does not reflect any appeal by WME.

dards of review . . . review of the decisions of the department is governed by c. 25, § 5, to the extent that § 5 contains a provision (as it does as to standing) relating to the particular aspect of review under consideration"). In *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667 (1975), we explored the distinction between an "aggrieved *party* in interest" under G. L. c. 25, § 5, and a "*person . . .* aggrieved by a final decision of any agency in an adjudicatory proceeding" under G. L. c. 30A, § 14. To establish standing to seek review under G. L. c. 25, § 5, a petitioner must show "either that the Department did in fact exercise its discretion pursuant to G. L. c. 30A, § 10, to admit the petitioner as an intervener; that as a matter of law the petitioner was entitled to intervene before the Department and was improperly denied that right; or that the petitioner is a person who as matter of constitutional or statutory law was entitled to participate fully in the proceedings and who on proper notice did make an appearance in said proceedings." *Save the Bay, Inc.*, *supra* at 673. See *SDK Medical Computer Servs. Corp.* v. *Professional Operating Management Group, Inc.*, 371 Mass. 117, 122 (1976) (" 'aggrieved *party*' [as contrasted with 'aggrieved *person*'] is customarily taken to mean one who has previously participated in an administrative hearing or was improperly denied the right to participate"); *Newton* v. *Department of Pub. Utils.*, 367 Mass. 667, 673-675 (1975). Because the department did not in fact exercise its discretion to admit Brockton Wood as an intervener,[7] and Brockton Wood did not make an appearance in the proceedings, the issue is whether Brockton Wood was entitled as a matter of law to intervene and was improperly denied that right.

No statute grants Brockton Wood the right to intervene in the department's contract review. The QF regulations allow

---

[7]The petitioners' reliance on *Sudbury* v. *Department of Pub. Utils.*, 351 Mass. 214 (1966), is unpersuasive. In *Sudbury*, the petitioners "participated in the hearings as fully as though their petitions [to intervene] had not been denied." *Id.* at 217-218. In this case the department did permit Brockton Wood to file submissions in the cost-benefit analysis.

the department wide discretion to grant, limit, or deny a person leave to intervene. 220 Code Mass. Regs. § 1.03 (1) (e) (1986).[8] Pointing to the expenditures made in formulating the proposal and in anticipation of departmental approval, the petitioners argue that due process requires that the contract review process be conducted as an adjudicatory hearing, and that intervention was constitutionally mandated. We disagree.

In *Forsyth School for Dental Hygienists* v. *Board of Registration in Dentistry*, 404 Mass. 211 (1989), we examined the issue whether a petitioner's interest in a favorable agency decision on a licensing application amounted to a "property interest" triggering due process requirements for an adjudicatory hearing. Noting that "[t]he school's right to engage in a lawful calling . . . is not equivalent to a right to practice its calling free from State regulation," *id.* at 215, we determined that the petitioner did not have such a property interest, *id.* at 214-217, even though "[t]he school's motive in petitioning the board . . . was to retain its competitiveness and its standing in its field." *Id.* at 213.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a *legitimate claim of entitlement* to it" (emphasis added). *Regents of State Colleges* v. *Roth*, 408 U.S. 564, 576-577 (1982).

Anticipation of the financial benefits that would accrue from departmental approval of a proposed public utility con-

---

[8]That regulation provides in relevant part that "[t]he Commission, or the presiding officer, shall rule on all such petitions and may grant a person leave to intervene as a party in the whole or any portion of a proceeding or may allow a person who is not a party to make limited appearance by making an oral or written statement of his position on the issue, or by such other participation as the Commission or the presiding officer may determine. Such grant may be conditioned on such terms as the Commission or presiding officer may direct." An agency may allow persons to participate in a proceeding without granting them standing as parties under G. L. c. 25, § 5. *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 673 (1975).

tract does not amount to a property interest requiring an adjudicatory proceeding. The petitioners attempt to distinguish *Forsyth* on the ground that in *Forsyth* a statute prohibited the action the petitioner desired to take. In this case, however, the petitioners well knew that the contract needed departmental approval. The petitioners had no legitimate claim of entitlement to the contract. In these circumstances, *Forsyth* controls. See *Roth, supra.*

Citing *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491 (1965); *Borden, Inc.* v. *Commissioner of Pub. Health,* 388 Mass. 707, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette,* 464 U.S. 936 (1983); *Newton* v. *Department of Pub. Utils.,* 339 Mass. 535 (1959); and *New York Cent. R.R.* v. *Department of Pub. Works,* 354 Mass. 332 (1968), the petitioners contend that the department was required to conduct an adjudicatory hearing in its review of the contract, even in the absence of a statutory or regulatory provision requiring an adjudicatory hearing. We do not agree. Nor do the cases on which the petitioners rely require an adjudicatory hearing in these circumstances.

In *Milligan, supra,* the board's decision involved "the determination by the board of the facts concerning each applicant and the place in which he [wished] to carry on business." *Id.* at 499. The petitioners do not dispute the facts, namely the number and significance of the changes to the originally proposed project, on which the department based its decision. See note 4, *supra.* Rather, the petitioners contend that the decision itself required an adversary proceeding and therefore the department's decision was erroneous. We do not agree.

In *Milligan* we concluded that denial of an individual's freedom to engage in a lawful private occupation mandated an adjudicatory hearing. *Id. Lotto* v. *Commonwealth,* 369 Mass. 775, 778-779 (1976) (when plaintiff not denied permission to earn living by pursuing otherwise lawful private occupation, no liberty or property interest mandates adjudicatory hearing). No such denial occurred in the current case. In *Milligan,* we noted that regulation of the petitioner's pro-

fession (pharmacology) beyond matters of public health (an aspect of the public interest directly affected by the petitioner's profession) raised "more difficult questions of constitutional validity . . . concerning whether particular statutes, regulations, or policies, or their application in particular circumstances, bear a reasonable relation to significant aspects of the public interest. Particularly is this so in respect of occupations other than those (for example . . . public utility operation . . . ) most obviously appropriately subject to public regulation." (Footnote omitted.) *Id.* at 498.[9]

In *Hamilton* v. *Department of Pub. Utils.*, 346 Mass. 130 (1963), there was no dispute that any appellant was an aggrieved party; further, that case did not focus on whether an adjudicatory hearing should be held, but rather on whether the requirements of an adjudicatory hearing were satisfied when an adjudicatory proceeding was in fact held. In *Borden, Inc., supra*, we required an adjudicatory hearing only with respect to the factual issue whether a given supplier provided a specific product, when the Legislature mandated that no supplier shall be required to repurchase a product except from the person to whom he or she sold it. *Id.* at 719. In *Newton* v. *Department of Pub. Utils*, 339 Mass. 535 (1959), we determined that hearings held by the department were "adjudicatory proceedings" under G. L. c. 30A, § 1 (1), because G. L. c. 160, §§ 128 and 128A, provided that "legal rights . . . of specifically named persons" were required to be determined after an agency hearing. The petitioners here point to no such statutory provision. *New York Cent. R.R.* v. *Department of Pub. Works*, *supra*, is inappli-

---

[9]If the department fails to issue a decision within sixty days a contract will be deemed to be approved. 220 Code Mass. Regs. § 8.03 (2) (a). That the regulations state that a contract will be deemed approved if the department has not issued a decision within sixty days of the filing of the contract indicates that the Legislature did not intend to require adjudicatory hearings in the contract review process. 220 Code Mass. Regs. § 8.03 (2) (a). We note in passing that the petitioners were unable to meet the twenty-day filing requirement mandated by the regulations in filing their memorandum in support of their motion for reconsideration. 220 Code Mass. Regs. § 1.11 (10).

cable, because the statute under consideration required an agency hearing.

The department's determination that allowance of changes in the project proposal adversely affected the public interest "fall[s] into the category of nonadjudicative, policy-making judgments, rather than party-specific fact finding." *Zachs* v. *Department of Pub. Utils.*, 406 Mass. 217, 221 (1989).[10] The case is remanded to the Supreme Judicial Court for Suffolk County for entry of a judgment dismissing the appeal because the petitioners are not aggrieved parties under G. L. c. 25, § 5.

*So ordered.*

---

[10]Neither *Armco Advanced Materials Corp.* v. *Pennsylvania Pub. Util. Comm'n*, 135 Pa. Commw. 15 (1990), nor *Barasch* v. *Pennsylvania Pub. Util. Comm'n*, 119 Pa. Commw. 81, modified, 119 Pa. Commw. 81 (1988), alters our analysis. *Barasch* focused on the property interest of a utility's ratepayers, as the Pennsylvania Public Utility Commission's approval of a prospective contract would have increased the ratepayers' bills in a manner unrelated to their consumption of power without providing notice and a hearing to the ratepayers. *Barasch, supra* at 100-101. Pennsylvania's public utility regulatory scheme differs significantly from Massachusetts'. 52 Pa. Code §§ 57.31-57.39 (1993). Pennsylvania's regulations do not provide for a solicitations process or mandate review of privately-negotiated contracts. Utilities sometimes condition their obligation (under privately-negotiated contracts) to purchase on preapproval from the Pennsylvania Public Utility Commission of cost-recovery provisions. *Armco Advanced Materials* v. *Pennsylvania Pub. Util. Comm'n*, 135 Pa. Commw. 15, 22 (1990).